Margaret **WILKERSON**, Plaintiff,

v.

**PILKINGTON NORTH AMERICA, INC., Defendant.**

**No. 1:01CV00055.**

United States District Court, M.D. North Carolina.

July 11, 2002.

Heidi G. Chapman, Chapel Hill, NC, Martha A. Geer, Patterson Harkeavy & Lawrence, Raleigh, NC, for plaintiff.

George H. Pender, Teague Campbell Dennis & Gorham, Raleigh, NC, Robert C. Ludolph, Kelly L. Schadel, Pepper Hamilton, LLP, Detroit, MI, for defendant.

## MEMORANDUM OPINION

TILLEY, Chief Judge.

Plaintiff Wilkerson filed suit under the North Carolina Retaliatory Employment Discrimination Act ("REDA") against Defendant Pilkington North America, Inc. ("Pilkington" or "Defendant"), alleging that she was wrongfully terminated for pursuing workers' compensation benefits. The case was removed by Pilkington to federal court on January 12, 2001 pursuant to 28 U.S.C. §§ 1441 and 1446. Pilkington has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure [Doc. # 11]. For the reasons set forth below, Pilkington's motion is GRANTED.

### I.

The facts, in the light most favorable to the Plaintiff, Margaret Wilkerson, are as follows. Pilkington North America (formerly Libbey–Owens–Ford Company during the time of Wilkerson's employment) is a manufacturer and seller of automotive glass. Wilkerson began working for Pilkington in April of 1977 and held positions

as a glass packer, a clerical employee and eventually was promoted to the position of forklift operator in Pilkington's cutting department. Until March 10, 1994, Wilkerson had not filed any grievances and she was satisfied with her work.

On March 10, 1994, Wilkerson was working as a forklift operator when a five-hundred pound case of glass fell on her, breaking her ankles and several vertebrae in her spine. She was taken to the hospital via ambulance and was hospitalized for one week. As a result of her injuries, Wilkerson was out of work for six months while she recovered and received worker's compensation from Pilkington. Pilkington also paid her medical bills. Wilkerson returned to work at her full salary on September 6, 1994, but was limited to light duty pursuant to orders from her doctor. "Light duty" meant that she was not to lift, push, stand for certain lengths of time, twist or bend. To make this accommodation, Wilkerson was permitted to remain on the production floor and perform tasks which required minimal physical labor, such as pressing buttons to operate a robotic picker located on the production floor.

Wilkerson states that when she returned from leave, her supervisors would try to get her to do jobs beyond her range of ability. On one occasion, her supervisor told her that she would be expected to move a ten-foot tall piece of glass. Wilkerson asked her physician if performing the task was within her physical limitations. She does not know if the physician contacted Pilkington, but she was ultimately not required to perform that task. After that incident, she states that Pilkington "got really nasty with [her about her physical limitations]" and raised its expectations of her. Wilkerson's supervisors called her in for meetings for small infractions of rules, such as taking longer breaks than

usual. Wilkerson also says her supervisors met with her on several occasions, suggesting that she was not pulling her weight within the department. She also believes that Pilkington hired a private detective to follow her.

On September 5, 1995, Wilkerson underwent a second surgery to remove the plate and screws that had been placed in her ankles as a result of her 1994 injuries and missed an additional three weeks of work. As a result, Pilkington reinstated her workers' compensation benefits for that period. When Wilkerson returned to work after the end of the three weeks, Pilkington's human resources department notified her that a data entry position had opened in the shipping department because the woman who had held the position had taken a leave of absence due to a non-work-related health problem. The shipping position allowed Wilkerson to do light work in accordance with her restrictions and Pilkington gave her a special chair to minimize her pain while she was working. Wilkerson worked in the shipping department for approximately one year. When the woman who had previously held the position in the shipping department returned to work, Wilkerson was transferred to human resources to work as a clerk.

Ms. Wilkerson began work with human resources beginning May 6, 1996. She was one of two clerks in the department. Pilkington does not dispute that her performance as a clerk was satisfactory. In Wilkerson's performance evaluation dated February 2, 1997, her supervisor noted her perfect attendance, positive attitude, and stated that she was "willing to take on any task and give it her best." (Pl. Br. in Opp'n to SJ [Doc. # 18], Ex. 7). He also noted that it was a "pleasure" to have Ms. Wilkerson in her department. (Pl. Br. in Opp'n to SJ [Doc. # 18], Ex. 7).[1] In 1997,

---

1. Plaintiff's counsel quotes Diann Beane's

comment in 1997 that Ms. Wilkerson was

however, Pilkington announced plans to reorganize and downsize its operations for financial reasons. As a result, Pilkington alleges that it ultimately cut the number of clerical positions from thirty positions to seven positions. In 1998, Linda Curry, the other clerk in the human resources department, announced her plans to retire, and allegedly as a result of the continued downsizing, the two clerical positions in human resources occupied by Curry and Wilkerson were combined into one position.[2] Wilkerson, however, was not automatically selected to take on the responsibilities of Curry's old position because Curry's job allegedly entailed additional duties which Wilkerson had not performed. The position was therefore posted company-wide, and Wilkerson was required to compete for the position with other applicants.

The day before the new clerical position in human resources was posted, John Argabright, the head of human resources, sent an e-mail arranging a meeting with Wilkerson and three other employees in clerical positions, all of whom had filed workers' compensation claims at some point during their employment at Pilkington. The four employees were told that Pilkington was downsizing for financial reasons and, as a result, the approximately thirty clerical positions at the plant would be combined and ultimately reduced to approximately seven positions. The four employees met with Argabright and the plant manager, Alex Locklear, and were told that "sweeper operator" positions were available and that the employees would be eligible for these positions with or without accommodations for their disabilities. Wilkerson told Mr. Argabright that she was too physically limited to perform the sweeper operator job. Argabright and Locklear allegedly promised that any necessary accommodations would be made for her limitations. The next day, the new clerical position in human resources was posted, stating that Curry planned to retire and the company wanted to fill the position internally. The job description included some responsibilities Wilkerson had not had in her clerical position with the department. To compete for the job, the applicants, including Wilkerson, were required to take several tests, including a computer skills test. The job was awarded to Annie Thornton, another employee who had sustained a work-related injury and had pursued her right to workers' compensation benefits and who scored highest on the tests.

Because Wilkerson was not awarded the position in Human Resources, the only position available to her within her limita-

---

"working as a clerk and doing well" in a sentence suggesting that the comment was based on Ms. Wilkerson's performance on the job. (Pl. Br. in Opp'n to Mot'n for SJ [Doc. # 18]). However, the document cited is a letter to Wilkerson's physician, and Beane's comment that Wilkerson was "doing well" related to her health, not her performance. Plaintiff's counsel has shown that Ms. Wilkerson's performance was satisfactory during the period she worked as a clerk in the human resources department, and her good performance is not disputed by Pilkington. Therefore, it was unnecessary for Plaintiff's counsel to even mention the comment since it is not probative of her performance.

2. Wilkerson contends that Pilkington's statement that the reduction was due to downsizing is a cover for a scheme to get rid of people with workers' compensation claims by taking them out of clerical positions and giving them more physically demanding jobs in hopes that they would quit or be fired under the one-year policy. Wilkerson argues that inconsistencies exist in Pilkingtons' statements concerning the downsizing; however, Defendants document clearly state that the downsizing began in 1997 and that the downsizing was still taking place in 1998.

tions was the position as sweeper operator. According to the position description, the employee was required to drive the sweeper machine and perform general maintenance on the machine. Wilkerson expressed concern that she would not be able to perform the job duties of the sweeper position because of her physical limitations. At the time, she had only been released by her doctor to perform light duty work, and her doctor had assessed that the sweeper position required medium, rather than light, exertion. Wilkerson was to report to work in the new sweeper position on August 10, 1998, but she did not show up for work. Instead, she sent a note from her doctor stating that she would be out for one week because of a lumbar fracture. When the week was up, Wilkerson sent another note stating that she would be out of work indefinitely due to traumatic arthritis. Pilkington placed her on sick leave. On August 13, 1998, Wilkerson filed a request for a workers' compensation hearing with the North Carolina Industrial Commission because she believed she should be receiving permanent and total disability benefits and other benefits as a result of her 1994 injury. Wilkerson received short-term disability from Pilkington equal to sixty percent of her base salary for twenty-four weeks while she was out of work.

In November of 1998, Annie Thornton moved and the clerical position in human resources was posted again. Wilkerson had still not returned to work, had not notified Pilkington that she was capable of any employment, and was not notified of the posting. Lucille Brock, another employee who had sustained a work-related injury and had pursued her right to receive workers' compensation, was given the position. In January of 1999, Wilkerson applied for and was denied long term disability by Pilkington's insurance carrier, CNA, because the carrier determined that her impairment did not prevent her from performing the duties of her previous clerical position. Wilkerson had not returned to work when she applied for the disability benefits. In February of 1999, after being on six months of leave because she could not perform the sweeper operator duties, Wilkerson began receiving Social Security disability benefits. In May of 1999, the workers' compensation hearing Wilkerson had requested in August of 1998 was held with the North Carolina Industrial Commission about her claim for temporary total disability benefits. As a result of the hearing, Pilkington agreed to pay temporary total disability benefits retroactive to August 10, 1998. During the summer of 1999, since Wilkerson had not returned to work, Pilkington tried to arrange for her to work with a vocational rehabilitation specialist to help her find employment within her physical limitations, but Wilkerson had become depressed as a result of her inability to work and the loss of her clerical position, and she told Pilkington that she would be unable to work with the rehabilitation specialist due to this depression.

Also during the summer of 1999, Wilkerson notified Pilkington of her intent to seek disability retirement benefits. To be eligible to receive these benefits, Wilkerson was required to provide proof that she was totally and permanently disabled from gainful employment. Wilkerson submitted letters from physicians stating that her physical condition and her depression meant that she was unable to perform any job. Pilkington initially denied Wilkerson's claim for retirement disability, but eventually awarded her disability retirement benefits on April 19, 2001, effective retroactively to September 1, 1999.

By August 24, 1999, Wilkerson had been on leave for more than twelve months. Pilkington had a policy, known to Wilker-

son, that employees who have been absent for twelve months for any reason are terminated.[3] Pilkington contends that the twelve month policy was consistently applied to all employees and is the sole reason for Wilkerson's termination. Wilkerson alleges that Pilkington terminated her in retaliation for pursuing workers' compensation claims in connection with her March 10, 1994 injury, as prohibited under the North Carolina Retaliatory Employment Discrimination Act, N.C. Gen.Stat. § 95–240 et seq. (2001) ("REDA").

## II.

Summary judgment is only proper when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Murrell v. Ocean Mecca Motel, Inc.,* 262 F.3d 253, 255 (4th Cir.2001); *Cox v. County of Prince William,* 249 F.3d 295, 299 (4th Cir.2001). Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. *Id.* at 248, 106 S.Ct. at 2510; *Cox* 249 F.3d at 299. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 206; *Cox,* 249 F.3d at

299; *Solers, Inc. v. Hartford Cas. Ins. Co.,* 146 F.Supp.2d 785, 791 (E.D.Va.2001). A party opposing the motion may not rest upon the pleadings but must instead provide evidence or point to evidence already on the record that would be sufficient to support a jury verdict in his favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 206. This evidence must be properly authenticated pursuant to Rule 56(e). *Orsi v. Kirkwood,* 999 F.2d 86, 92 (4th Cir.1993). Furthermore, even where intent and motive are crucial to determining the outcome of the cause of action, conclusory allegations and unsupported speculation are insufficient to withstand summary judgment review. *See Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 960 (4th Cir.1996); *Cross v. Bally's Health & Tennis Corp.,* 945 F.Supp. 883 (D.Md.1996).

## III.

■ To bring a claim under the REDA alleging retaliation for filing a workers' compensation claim, an employee must first file a written complaint with the Commissioner of Labor within 180 days of the alleged violation. N.C.Gen.Stat. § 95–242(a). If, after an investigation, the Commissioner determines that there is not reasonable cause to believe that the allegation is true, the Commissioner will dismiss the complaint and issue a right-to-sue letter, allowing the employee to bring a civil action. *Id.* An employee who has been issued a right-to-sue letter may then commence a civil action within 90 days of the issuance of the right-to-sue letter. Wilkerson's complaint was filed with the Commissioner of Labor on February 18, 2000.

---

**3.** Wilkerson contends that she did not understand that the twelve-month rule applied to her, despite receiving two letters from Pilkington prior to her termination which indicated that she was subject to the rule. Wilkerson stated in her deposition that she believed the twelve-month policy only applied to em-

ployees who had taken leave under the FMLA. Although Wilkerson was on FMLA leave prior to her termination and was therefore subject to the twelve-month policy, she contends that Pilkington had not informed her that she was on leave under the FMLA.

The only alleged violation which occurred within 180 days of the filing of the complaint was Wilkerson's termination on August 24, 1999. Therefore, acts alleged by Wilkerson to also be retaliatory, such as her transfer to sweeper position, may only be considered as evidence that her termination was retaliatory and not as separate retaliatory acts in their own right. *Nat'l R.R. Passenger Corp. v. Morgan,* —— U.S. ——, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (limiting the continuing violation theory to hostile work environment claims but stating that prior acts may be used as background evidence in support of a timely claim).

"[The REDA] does not prohibit all discharges of employees who are involved in a workers' compensation claim, it only prohibits those discharges made *because* the employee exercises his compensation rights." *Johnson v. Tr. of Durham Tech. Comm. Coll.,* 139 N.C.App. 676, 535 S.E.2d 357 (2000) (quoting *Morgan v. Musselwhite,* 101 N.C.App. 390, 399 S.E.2d 151 (1991)) (emphasis in original). Therefore, proof of a causal connection between the filing of the workers' compensation claim and the adverse employment action is required.[4] The statute also provides an affirmative defense for employers, stating that the employer has not violated the statute if it can show "by the greater weight of the evidence that it would have taken the same unfavorable action in the absence of the protected activity of the

---

4. In *Abels v. Renfro Corp.,* 335 N.C. 209, 215, 436 S.E.2d 822, 825 (1993), the North Carolina Supreme Court declined to adopt "the complicated analysis used in federal employment discrimination cases as a model for how a retaliatory discharge case based upon the filing of a workers' compensation claim should be developed in our North Carolina courts." *Abels,* 335 N.C. at 214, 436 S.E.2d at 825. The court did, however, determine that federal decisions could be used for "guidance in establishing evidentiary standards and principals of law to be applied in discrimination cases." *Id. Abels* concluded that evidence offered by an employer of its treatment of similarly situated employees should be permitted as circumstantial evidence that retaliation did not take place. *Id.*

Federal district courts have interpreted the *Abels* opinion to suggest that the test established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), should be applied to claims under the REDA, despite the North Carolina Supreme Court's statement in *Abels* declining to adopt the analysis. *Greene v. Dialysis Clinic, Inc.,* 159 F.Supp.2d 228 (W.D.N.C.2001) (stating employee must show (1) that she was discharged; (2) that she filed a workers' compensation claim, or was about to file a claim and (3) retaliatory motive was a substantial factor in the decision to terminate employment); *Martin v. Nationwide Mut. Ins. Co.,* No. 1:99CV00956, 2001 WL 604192 (M.D.N.C. Apr.20, 2001) (combining analysis of Plaintiff's claims under the ADEA and REDA, and citing *Wiley v. United Parcel Serv.,* 102 F.Supp.2d 643 (M.D.N.C.1999), as "precedent ... that the *McDonnell Douglas* burden-shifting scheme provides the appropriate analysis for claims of retaliation under both the ADEA and the REDA"); *Wiley,* 102 F.Supp.2d at 650 (using *McDonnell Douglas* proof scheme for REDA); *Sayers v. ABB C–E Serv., Inc.,* No. 4:97CV37, 1997 U.S. Dist. LEXIS 18304, at *9 (W.D.N.C. Oct. 15, 1997) (using *McDonnell Douglas* proof scheme for REDA). In *Abels,* the North Carolina Supreme Court relied upon the "terms of the statute itself" to determine if the plaintiff in the case had made a showing necessary to withstand a motion for directed verdict and motion for judgment notwithstanding the verdict. *Abels,* 335 N.C. at 214, 436 S.E.2d at 825.

As Pilkington points out, the analysis under either *McDonnell Douglas* or the North Carolina statute would be nearly identical. In both instances, Wilkerson must show a causal connection between her pursuit of workers' compensation benefits and her termination, and Pilkington would be entitled to summary judgment upon a showing that it would have terminated Wilkerson's employment in any event. Under the REDA, however, Pilkington has a burden of persuasion, not production, in making this showing. N.C. Gen.Stat. § 95–241(b).

employee." N.C. Gen.Stat. § 95–241; *Watkins v. Martin Mills, Inc.*, No. Civ. 3:96CV178, 1996 WL 1132745 (M.D.N.C. Dec.13, 1996) (recognizing employer's affirmative defense within the statute). Pilkington contends that Wilkerson has not shown a causal connection and has it has shown it would have fired Wilkerson under the one-year policy in any event.

In order to determine if a causal connection has been established in a case under the REDA, North Carolina courts and federal courts with diversity jurisdiction require a "close temporal connection between the filing of the claim and the alleged retaliatory act." *Johnson*, 139 N.C.App. at 682, 535 S.E.2d at 360 (quoting *Shaffner v. Westinghouse Elec. Co.*, 101 N.C.App. 213, 398 S.E.2d 657 (1990)); *Morgan*, 101 N.C.App. at 393, 399 S.E.2d at 153. Where too much time has passed between the filing of the workers' compensation claim and the adverse employment action, courts have found that it is unreasonable to infer that retaliation was the reason for the adverse employment action. *Shaffner*, 101 N.C.App. at 216, 398 S.E.2d at 659 (finding no close temporal proximity when three months passed). While an exact time period required for a temporal connection has not been established by courts evaluating REDA claims,[5] it has been held that ninety days between the filing of a workers' compensation claim and the employer's adverse action is too long to create an inference of retaliation. *Shaffner*, 101 N.C.App. at 213, 398 S.E.2d at 657.

In this case, Wilkerson's first workers' compensation claim was filed more than five years before she was terminated. Her second workers' compensation claim was filed after her second surgery in May of 1996, more than three years before her termination. These periods are too long for a reasonable juror to infer a causal connection between Wilkerson's termination and the filing of these workers' compensation claims. *Greene*, 159 F.Supp.2d at 228 (stating no causal connection when plaintiff was fired at end of her leave two years after filing of workers' compensation claim); *Johnson*, 139 N.C.App. at 676, 535 S.E.2d at 357 (stating no causal connection when plaintiff was fired less than one year after filing of workers' compensation claim and had entered into three new contracts); *Watkins*, 1996 WL 1132745, at *4 (M.D.N.C. Dec.13, 1996) (finding two years is too long for causal connection). Wilkerson last requested workers' compensation in August of 1998, when she requested a hearing from the North Carolina Industrial Commission workers' compensation commission about receiving temporary total disability. As a result of the hearing, held in May of 1999, Pilkington was required to pay temporary total disability benefits.[6]

---

**5.** *Allen v. Grandfather Home for Children, Inc.*, No. 1:99CV73–C, 2000 WL 1809004 (W.D.N.C. Aug.30, 2000) (finding that Plaintiff's employment was terminated one hundred days after he made the claim and noting in North Carolina even ninety days is not considered to be a close temporal connection (citing *Shaffner*, 101 N.C.App. at 213, 398 S.E.2d at 657)); *Wiley v. United Parcel Serv., Inc.*, 102 F.Supp.2d 643 (M.D.N.C.1999) (finding Plaintiff's most recent claim had been brought five months before his discharge and six months before Defendant's refusal to reinstate him); *Watkins v. Martin Mills, Inc.*, No.

Civ. 3:96CV178, 1996 WL 1132745, at *4 (M.D.N.C. Dec.13, 1996) (stating that a close temporal connection is required and that two years is too long); *Shaffner*, 101 N.C.App. at 213, 398 S.E.2d at 657 (finding that three months is too long).

**6.** When a plaintiff has filed more than one workers' compensation claim over a period of time, courts have evaluated the time period between each claim and the adverse employment action. *Wiley*, 102 F.Supp.2d at 643; *Johnson*, 139 N.C.App. at 682, 535 S.E.2d at 360. Therefore, the fact that Wilkerson first

Pilkington argues that because Wilkerson filed the claim for temporary total disability in August of 1998, Pilkington knew about the claim as of that date and took no retaliatory action at the time. Therefore, Pilkington contends, no causal connection can be shown because nearly a year passed between the filing of the last claim and Wilkerson's termination. Wilkerson contends, however, that the period of time should be counted from the date Pilkington was "forced" to pay workers' compensation because a motive for retaliation existed. Under either scenario, too much time passed to establish a causal connection.

Wilkerson further argues that the three month time period between May and August of 1999 should be combined with other events which occurred over the summer to create a sufficient inference of retaliation. Later in the summer of 1999, after Wilkerson's workers' compensation hearing with the Industrial Commission, Pilkington asked her if she would be willing to work with a rehabilitation specialist to help with her disability. Wilkerson refused the help because she stated that she was too depressed. Wilkerson contends that Pilkington made this offer "so that it could avoid paying benefits," and that this offer and the fact that Wilkerson was fired three months after the Industrial Commission hearing provide sufficient evidence for a juror to find that Wilkerson was fired because she filed for workers' compensation. A statement by Wilkerson that this offer was in bad faith does not constitute evidence that the offer was made to avoid paying benefits.[7] Therefore, Wilkerson has not met the temporal proximity requirement.[8]

Wilkerson argues that all of the events following her 1994 workers' compensation claim, taken together, show a "temporal sequence" of retaliation.[9] However, she provides no evidence to support a reasonable inference of retaliation, other than her mere speculation that Pilkington removed her from the clerical position in human resources in 1998 intentionally, knowing

filed a workers' compensation claim five years before her termination does not conclusively establish that no causal connection existed between her filing of the last claim and her termination.

7. In fact, evidence exists in the record that she actually requested such training at one point during the year she was out of work prior to her termination. The document filed by Ms. Wilkerson in connection with her request for temporary total disability benefits in August 1998 also requested "vocational rehabilitation and retraining." While the details surrounding Pilkington's offer of the training have not been offered by either party, the document filled out by Wilkerson in filing for temporary total disability shows clearly that at one point she did request such training.

8. Wilkerson also filed for disability retirement benefits in August of 1999, shortly before she was fired. This is the only claim filed within a time period that would meet the temporal proximity requirement, but this appears to be a claim under ERISA and it cannot be determined based on the filings of the parties whether the claim falls under the REDA. However, the nature of the claim is irrelevant because Wilkerson does not argue that the claim should be considered and temporal proximity alone is not sufficient to establish a reasonable inference of retaliation under the REDA. *Martin*, 2001 WL 604192, at *9 ("The Fourth Circuit has recognized that although temporal proximity is a factor to be considered in the evaluation of a retaliatory discharge claim, it alone is insufficient to support such a claim." (citations omitted)); *Morgan*, 101 N.C.App. at 393, 399 S.E.2d at 153.

9. Wilkerson argues that her case is analogous to those she cites in her brief; however, the cases cited show that the Court in each instance had evidence in the record of retaliatory acts. Here, Wilkerson provides no evidence of retaliation other than her own speculation.

that she would be unable to perform the duties of the sweeper position.[10] Then, Wilkerson contends, upon learning that she would not meet with a vocational rehabilitation specialist, Pilkington fired her in order to avoid continuing to pay workers' compensation.

■ Wilkerson further contends that the clerk position reopened in the human resources department in November 1998 and that Pilkington intentionally did not notify her that the position had reopened. When an employer has a good faith belief that an employee is unable to work and has not been notified otherwise, the employer has no obligation to tell the employee about job openings. *Sayers*, 1997 U.S. Dist. LEXIS 18304, at *6 (finding no obligation on part of defendant when plaintiff did not provide defendant with any notice that his restrictions had been lifted and he was physically able to work); *Watkins*, 1996 WL 1132745 at *5 (stating evidence that defendant hired others for positions within plaintiff's limitations while plaintiff was on leave is only probative if plaintiff can show she informed defendant she was ready to return to work). Wilkerson's

notes from her physicians stating that she was unable to work did not specify that Wilkerson was able to work in any position at Pilkington's plant and Wilkerson never indicated that she was able to return to work. Therefore, Pilkington had no reason to believe that Wilkerson would be capable of performing the tasks required. Furthermore, Wilkerson had competed for the position and was not chosen. In hiring a replacement, Pilkington was not required to accept her even if she was capable of performing the task. Wilkerson's claim cannot survive summary judgment because she has not produced evidence sufficient to support a reasonable inference that a causal connection exists between the filing of her workers' compensation claims and her termination.

■ Even if Wilkerson were able to show a causal connection, Pilkington in this case has provided the affirmative defense outlined in the REDA statute, and Wilkerson has not provided any evidence to refute the defense. N.C.G.S. 95–241(b). Under the REDA, the employer has the burden of persuasion and must prove "by the greater weight of the evidence that it

10. Lucille Brock, Annie Thornton, and Johnny Pruitte were the other employees offered positions as sweeper operators. Annie Thornton was offered the clerical position in the human resources department. Lucille Brock submitted an affidavit stating that she and Mr. Pruitte performed the duties of the sweeper position with the accommodations for their restrictions. Lucille Brock worked in the sweeper position from August 1998 to November 1998, when she was awarded the clerical position in human resources. Mr. Pruitte performed the sweeper position with accommodations from August 1998 until he left the plant in August 2000. (Brock Aff., ¶¶ 6,13).

Wilkerson points out that Lucille Brock and Annie Thornton had both settled their workers' compensation claims previously, while she and Johnny Pruitte each had active workers' compensation claims. Wilkerson con-

tends that Brock and Thornton were offered the clerical position, while she and Pruitte were not, because Pilkington was retaliating against Wilkerson and Pruitte for having active workers' compensation claims. Wilkerson provides no evidence to support this contention, or to show that Brock and Thornton otherwise had not earned the clerical position. Wilkerson has also ignored the fact that Ms. Brock actually did perform the sweeper position until Ms. Thornton moved away. Moreover, even if this were evidence that Pilkingtons' reassignment of Wilkerson to the sweeper position in 1998 was in retaliation for having an active workers' compensation claim, that retaliatory action would not be actionable. It would have to serve as evidence that her termination over one year later was retaliatory, and Wilkerson has provided no evidence of a connection between the two actions by Pilkington.

would have taken the same unfavorable action in the absence of the protected activity of the employee." *Id.* Pilkington submits that Ms. Wilkerson was terminated pursuant to a company-wide policy which provides that any employee who has been absent for one year will be terminated.

Pilkington has presented evidence in the form of the company manual, affidavits, and letters showing that Wilkerson was terminated pursuant to company-wide policy stating that any employee absent for one year for any reason will be terminated.[11] Included in the affidavits are statements from John Argabright, the Human Resources Manager for Pilkington from 1997 until 2000, and Diann Beane, the Health and Safety Specialist for Pilkington from 1997 to the present. Both state that the policy has been consistently applied to all employees. Ms. Beane also states that she reviewed company records and that these records show at least twenty-six employees have been terminated under the Extended Absences Policy since its inception. Neither Argabright nor Beane were

aware of any employee who had been absent for twelve months and had not been terminated under the Extended Absences Policy. Wilkerson provides no admissible evidence to refute the statements in these affidavits, only her own deposition stating that two employees told her that they had been permitted to return after one year. She does not provide affidavits from these individuals.[12]

Policies allowing for the termination of an employee after being absent for a specified period of time have been upheld as a legitimate reason for terminating an employee under the REDA context. *Watkins,* 1996 WL 1132745, at *4 (finding defendant's affirmative defense was valid because company had standard policy of terminating those not returning from leave and plaintiff did not show that others who did not return post-leave were treated more favorably); *Morgan,* 101 N.C.App. at 392, 399 S.E.2d at 152 (discussing sixty day leave-of-absence policy). Wilkerson argues that she "would not have been left stranded for 12 months without a job that

---

**11.** Wilkerson attached a letter she received on May 27, 1999 from Emily Womble, the human resources specialist for Pilkingon. According to the letter, Wilkerson had been inadvertently sent notice on May 7, 1999 indicating that she was being terminated under Pilkington's one-year policy. Ms. Womble assured Wilkerson in the letter that a misunderstanding had occurred concerning the total amount of time Wilkerson had been out of work and that the letter was incorrect in stating that Wilkerson had been terminated pursuant to the one year policy. Ms. Womble further stated Wilkerson would be terminated pursuant to the policy if she did not return to work by August of 1999. Wilkerson included this letter to support her contention that Pilkington attempted to fire her but rescinded the termination when it realized "that the termination was inconsistent with company policy." (Pl. Br. in Opp. to Mot. for S.J. [Doc. # 18], at 8). Wilkerson offers no support for this suggestion that the termi-

nation attempt was intentional. Plaintiff's counsel's statement that the termination was "inconsistent with company policy" actually refers to the fact that company policy was to terminate after one year, and Pilkington had mistakenly fired Ms. Wilkerson before that.

**12.** It should be noted that Plaintiff's counsel maintains that Plaintiff had worked in human resources and "had access to the files," suggesting that Wilkerson had seen records indicating that other employees had been permitted to return to work after having been absent for one year. However, the statement that she "had access to the files" literally refers to a statement in Wilkerson's deposition stating that "a human resource clerk does employee records and posting." (Wilkerson Depo, at 31, ll. 6–7). Wilkerson does not assert anywhere in her deposition that she had personal knowledge of employees who were not terminated despite being absent for more than one year.

she could perform had [Pilkington] allowed her to continue in her Human Resources Clerk Grade 4 position." (Pl. Br. in Opp'n to SJ [Doc. # 18], at 16). However, the REDA does not require employers to find positions for their injured workers. It merely forbids employers from retaliating against employees for filing workers' compensation claims. N.C. Gen.Stat. §§ 95–241 to –243; *Watkins*, 1996 WL 1132745, at *3 ("REDA, unlike the Americans with Disabilities Act, does not require job modification. Instead, employees who file workers' compensation claims."). Wilkerson provides no evidence that Pilkington moved her from the human resources position out of retaliation for her filing a workers' compensation claim.

The claim under the REDA is the only claim asserted by Wilkerson with respect to her termination by Pilkington. Wilkerson has not submitted sufficient evidence to create a reasonable inference that Pilkington terminated her because she filed a workers' compensation claim. Furthermore, Wilkerson has been unable to show that a reasonable juror could find she would not have been terminated under Pilkington's Extended Absences policy even if she had not filed workers' compensation claims. Therefore, Pilkington's Motion for Summary Judgment is GRANTED and Wilkerson's claims are DISMISSED WITH PREJUDICE.

### JUDGMENT

This case is now before the Court on Defendant Pilkington North America, Inc.'s Motion for Summary Judgment [Doc. # 11] pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth in a contemporaneously filed Memorandum Opinion, Pilkington's Motion for Summary Judgment is GRANTED and this case is DISMISSED WITH PREJUDICE.