**Gregory M. DELON, Plaintiff,**

v.

**McLAURIN PARKING COMPANY, Defendant.**

**No. 1:03CV01066.**

United States District Court, M.D. North Carolina.

March 18, 2005.

S.Ct. 919, 44 L.Ed. 1140 (1900); *Whitfield v. Gilchrist*, 348 N.C. 39, 497 S.E.2d 412 (1998).

Janet Knight Ledbetter, Hillsborough, NC, for Plaintiff.

Charles Matthew Keen, Robert A. Sar, Raleigh, NC, for Defendant.

*ORDER and JUDGMENT*

OSTEEN, District Judge.

The court has before it this Standing Order 30 recommendation by the Magistrate Judge that Defendant's Motion for Summary Judgment be granted. Plaintiff timely objected to the recommendation. Defendant responded to the objection and Plaintiff replied.

The record, including Plaintiff's objection, Defendant's response, and Plaintiff's reply, have been reviewed by this court, and it is the opinion of this court that the recommendation is in accord with the facts and the prevailing law. The court adopts the recommendation of the Magistrate Judge entered February 10, 2005, as its own findings and conclusions.

IT IS THEREFORE ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (Doc. No. 12) should be and is hereby granted.

IT IS FURTHER ORDERED AND ADJUDGED that all other pending motions are denied as moot.

IT IS FURTHER ORDERED AND ADJUDGED that this proceeding is hereby dismissed with prejudice.

## ORDER AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

DIXON, United States Magistrate Judge.

Plaintiff, a former employee of Defendant McLaurin Parking Company (Defendant), has sued Defendant alleging race and color discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); a violation of the North Carolina Retaliatory Employment Discrimination Act (REDA), N.C. GEN. STAT. § 95–240 *et seq.;* wrongful discharge in violation of North Carolina public policy; and race discrimination and retaliation under 42 U.S.C. § 1981. Plaintiff has received Right-to-Sue letters from both the EEOC and the North Carolina Department of Labor which are attached to the complaint (docket no. 1). This matter is before the court on Defendant's motion for summary judgment (docket no. 12). The parties have filed responsive pleadings and this matter is ripe for disposition.

Also before this court are Plaintiff's motion to admit evidence of criminal acts of bribery, conspiracy and obstruction of justice on the part of Defendant (docket no. 14); Defendant's motion to strike Plaintiff's motion to admit evidence (docket no. 15); and Defendant's motion to strike inadmissible portions of Plaintiff's brief (docket no. 19). Plaintiff has responded to Defendant's motions to strike, although he did so after the 20–day period for filing such pleadings had expired. These matters, also, are ripe for disposition. For the reasons which follow, it will be recommended that the summary judgment motion be granted, and the remaining motions will be denied as moot.

## I. Factual Background

Plaintiff is an African–American male whose employment with Defendant was terminated on January 9, 2003. Defendant manages parking lots and provides parking logistical services to clients including the University of North Carolina Hospitals (Hospital). Specifically, Defendant provides the Hospital with parking services that include valet parking, shuttle driving and traffic monitoring. Decl. of Cowley, ¶ 3.[1]

---

1. All depositions and declarations cited can be found attached to Defendant's memorandum in support of summary judgment (docket no. 13).

Plaintiff was hired by Defendant as a parking attendant in June 2001. At that time, his wife, Rita Stone, was also employed by Defendant as a parking attendant at the Hospital. Dianne Swearingen was Defendant's Hospital worksite manager, and she hired both Stone and Plaintiff. Decl. of Swearingen, ¶ 5. As employees for Defendant, Plaintiff and Stone were subject to the policies set out in Defendant's Handbook. Both Plaintiff and Stone received copies of the Handbook. Plaintiff testified that he read and understood the information specified in the Handbook. Dep. of Delon, vol. I, pp. 31–32.

Defendant's Handbook specifically prohibits "[e]xhibiting a bad attitude toward work, the spreading of rumors or malicious gossip, or making any negative disparaging or unflattering statements to anyone (other than the communication of a bona fide grievance) about the Company, the Company's management or any other Company employee." "MP Documents," Personnel Policies, p. 25 (attached to docket no. 13). Likewise, the Handbook explains its Open Door Policy: "While questions or differences of opinion may occur from time to time, the Company has an OPEN DOOR POLICY at all levels of management and encourages any employee to take questions, suggestions or problems to his supervisor." *Id.* at 9. Plaintiff is accused of having circumvented these policies.

Both Plaintiff and Stone continued to be employed as parking attendants for Defendant for over a year after Plaintiff was initially hired. Then, in August 2002, Plaintiff was promoted to the position of cashier at an increased pay rate of $9.75 per hour. Dep. of Delon, vol. 1, p. 41. Nearly one month later, on September 6, 2002, Stone's employment with Defendant was terminated. Decl. of Swearingen, ¶ 6.

Termination of Stone's employment is significant only in that it appears to have instigated Plaintiff's practice of keeping a notebook to record complaints and concerns about work. He testified at his deposition that his wife's firing was "the straw that broke the camel's back," leading him to begin "taking notes." Dep. of Delon, vol. I, p. 62. Plaintiff began keeping his notebook of complaints on the day Stone was fired, dating his first entry September 6, 2002. *Id.*

Some form of this notebook, or at least a typed copy of the notes taken therein, is attached to Defendant's memorandum in support of summary judgment as "Deposition Exhibits." The complaints, which span the four months between September 2003 and January 2004, cover a wide range of topics from the physical working conditions (smell of raw sewage, standing outdoors in all weather), to the efficiency of the system for parking cars (lack of supervision, missing money, too few workers during busy times), to the personal misdeeds of Swearingen and other supervisors (long lunch breaks, long periods of absence from the work station, misuse of state property and services), and the granting of favors to white customers. Significantly, by his own admission in these notes, Plaintiff did not show his notes to Kristy Eubanks, Defendant's president, until after he was fired on January 9, 2003.

Plaintiff generally characterizes the purpose of keeping the notebook as documenting abuse at work. At one point in his deposition, Plaintiff said he began taking notes because a fellow employee who went through the proper complaint proceedings with Defendant was fired, having been told that she did not have any notes or records regarding "incidents of things that happened on the job." Dep. of Delon, vol. I, p. 62. Plaintiff affirms that he "beg[a]n keeping [his] notebook because [he] wanted to prove that employees were being abused and mistreated by the supervi-

sors." *Id.* vol. II, p. 25. He further explains that "I was trying my best to correct a problem that was of public concern and stop the abuse of my customers and also solve the traffic problems for everybody that came there." *Id.* at 44.

Nevertheless, Defendant suggests that Plaintiff kept the notebook for the purpose of directly attacking Swearingen. Defendant claims that after Plaintiff's wife was fired, Plaintiff "began a retaliatory campaign to develop 'evidence' that would lead to removal of Ms. Swearingen from her management position." Def.'s Mem. in Supp. of Summ. J., p. 3. Defendant claims that Plaintiff's "purported overriding concern and the focus of his notebook entries dealt with his belief that Ms. Swearingen took too long a lunch break." *Id.* at 4. Defendant further shows that "[t]he notebook describes events ranging from the mundane to uneducated, wild and accusatory speculation that Ms. Swearingen and other managers might be engaging in various types of improper conduct," and cites a list of examples. *Id.* at 5–6. Eubanks declares that Plaintiff "indignantly and unapologetically informed me that he had compiled substantial evidence of wrongdoing by Ms. Swearingen[,] that he had documented it in a notebook for several months, that he had discussed these issues with co-workers and deliberately cho[ ]se not to bring it to the attention of management." Decl. of Eubanks, ¶ 8.

Plaintiff's co-workers seem, also, to have viewed Plaintiff's collection of notes as fodder to be used against Swearingen. Plaintiff freely admits to attempting to enlist his co-workers in preparing evidence against Swearingen and other supervisors, asking them to sign petitions about various concerns. One of these petitions claimed that Swearingen had falsified her time records to increase her personal paycheck. Dep. of Delon, vol. II, pp. 25–29. By January 2003, Plaintiff's co-workers were complaining to employee Kara Leach about Plaintiff's criticism of Swearingen.[2] Decl. of Leach, ¶ 10. Leach informed Swearingen that Plaintiff was "keeping a book" on Swearingen. Decl. of Swearingen, ¶ 9. According to Leach, co-workers were so aggravated by Plaintiff's "constant criticism" of Swearingen that they tried to avoid talking with him. Decl. of Leach, ¶ 10. Leach further clarifies that Plaintiff never discussed concern over safety issues with her. *Id.* ¶ 5.

On January 8, 2003, Melinda Cowley, Defendant's Division Manager, met with Plaintiff and Swearingen to discuss the problem of having too many cars queued on the curb while Plaintiff was working. Decl. of Cowley, ¶ 6; Decl. of Swearingen, ¶ 12. On the way to the meeting, while alone with Cowley, Plaintiff criticized Swearingen's management, but did not accuse her of any illegal activity or mention the notebook. Decl. of Cowley, ¶ 7. Plaintiff testified that he thought he would get fired for complaining about Swearingen. Decl. of Delon, vol. I, pp. 66–67, 70. After the meeting, Cowley asked Swearingen about Plaintiff's allegations and Swearingen revealed that she had heard about Plaintiff's notebook and about his co-workers' dissatisfaction with Plaintiff's complaining. Decl. of Cowley, ¶ 10. Cowley reported this information to Eubanks.

On January 9, 2003, Plaintiff's employment was terminated during a meeting with Eubanks and Cowley. Cowley claims that they terminated Plaintiff's employment after he admitted to keeping a notebook and talking to other employees about Swearingen, but that he refused to provide

---

**2.** Leach also claims in her deposition that she did not sign Plaintiff's petition about Swearingen's time sheets, Decl. of Leach, ¶ 8, but her signature is nevertheless on the copy of the petition provided to this court. *See* Petitions dated 1/02/03 (attached to docket no. 18).

the information to them. *Id.* ¶ 14. Specifically, Cowley cites violations of Rule 24 of the "Prohibited Conduct" section of the Handbook and Plaintiff's failure to report his concerns to management promptly. *Id.* ¶ 15. Eubanks offers that she fired Plaintiff "[i]n light of his unapologetic[ ] defiance and deliberate violation of our Work Rule 24 against spreading rumors, malicious gossip and making negative and unflattering statements about co-workers, coupled with his deliberate disregard for our open door policy." Decl. of Eubanks, ¶ 9. Further, Eubanks testifies that she has "never understood [Plaintiff] to claim that he made a safety or health complaint." *Id.*

Plaintiff's own statements match the reasons given by Cowley and Eubanks for the termination of his employment. He admitted to knowing about the company policy requiring him to bring any complaints or grievance to the management. Decl. of Delon, vol. I, p. 96. He testified that "all the co-workers" knew about his notebook. *Id.* at 61. He also viewed himself "more or less like a union representative," *id.* vol. II, p. 21, and as already noted, *supra* at 6, he prepared a petition for co-workers to sign to support his claim that Swearingen falsified her time sheets, *id.* at 25–29. Nevertheless, according to his own testimony and in clear violation of company policy, Plaintiff claims that he never informed any McLaurin manager about the complaints in his notebook until the day that his employment was terminated. *Id.* at 20. This court notes that Plaintiff is purported to have expressed concerns about Swearingen's management to Cowley the day *before* his employment was terminated, *see* Decl. of Cowley, ¶ 7, but that discrepancy does not affect the following analysis.

All parties agree that this January 9 meeting was the first time that Plaintiff brought his notebook and practice of keeping notes on Swearingen to the attention of Cowley and Eubanks. Likewise, all parties agree that the only complaints he made to either Cowley or Eubanks prior to being fired were about Swearingen's management, and that Plaintiff expressed fear that he would be fired for complaining about his supervisor. Although Plaintiff had met with Cowley and Swearingen to discuss traffic problems at the valet station, there is no evidence that Plaintiff ever made any official health or safety complaints, and indeed, his administrative filings with the EEOC and the North Carolina Department of Labor, both made in July 2003, followed, and did not precede, the termination of his employment with Defendant. *See* Compl., ¶¶ 6–7, and attached Right–to–Sue letters.

## II. Defendant's Motion for Summary Judgment

### *Standard of Review: Summary Judgment Standard*

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. International Bus. Machs. Corp.,* 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires a trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact-finder to return a

verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir.1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331, 106 S.Ct. 2548 (Brennan, J., dissenting). When making the summary judgment determination the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir.1997).

### Discussion

In his complaint, Plaintiff makes four claims. In claim I, he alleges that Defendant discriminated against Plaintiff, in violation of Title VII, by creating a hostile work environment, by terminating Plaintiff's employment based upon race, and "according to the conditions" of Plaintiff's employment. In claim II, he alleges that Defendant fired Plaintiff in violation of REDA. In claim III, he alleges that Defendant's firing of Plaintiff was a wrongful discharge under common law because it was contrary to public policy. Finally, in claim IV, he alleges that Defendant discriminated against Plaintiff, in violation of 42 U.S.C. § 1981, by terminating Plaintiff's employment based upon race. For the purposes of this recommendation, discussion of these claims will be structured as follows: a) racial discrimination claims: i) discriminatory termination of employment based upon race in violation of Title VII and 42 U.S.C. § 1981; and ii) creation of a hostile work environment in violation of Title VII; b) termination of employment in violation of REDA; and c) termination of employment in violation of the common law policy against wrongful discharge.

### a. Racial Discrimination Claims

■ To begin with, this court notes that in a Title VII employment discrimination or harassment case, the scope of a civil lawsuit is defined by the charges in a plaintiff's EEOC filing. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir.2000) ("A plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit." (citing *Evans v. Technologies Applications and Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir.1996))); *see also King v. Seaboard Coast Line R.R.*, 538 F.2d 581, 583 (4th Cir.1976). The scope is limited such that "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *King*, 538 F.2d at 583. In this case, however, neither Plaintiff nor Defendant has directed the court to the claims initially stated by Plaintiff. Therefore, the court will assume that the scope of the administrative charges are not exceeded by the scope of the complaint allegations.

The Title VII and § 1981 claims must be analyzed under the burden shifting scheme established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Gairola v. Va. Dept. of Gen. Serv.*, 753 F.2d 1281, 1285 (4th Cir.1985). According to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to set forth a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant is able to make such a showing, then the "presumption of discrimination drops out of the picture," and the plaintiff must prove that the legitimate, nondiscriminatory reasons

offered by the employer were merely a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

 i. Discriminatory Termination in Violation of Title VII and 42 U.S.C. § 1981

In order to establish a prima facie case of discriminatory termination of employment based upon race, a plaintiff must show that: (1) he is a member of a protected class; (2) he suffered some adverse employment action; (3) his job performance met the employer's legitimate expectations; and (4) the adverse employment action occurred under circumstances that support an inference of unlawful discrimination. *Wagstaff v. City of Durham,* 233 F.Supp.2d 739, 744 (M.D.N.C.2002); *McKiver v. General Electric Co.,* 11 F.Supp.2d 755, 758 (M.D.N.C.1997) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). That Plaintiff is a member of a protected class who suffered an adverse employment action is uncontested in this case. Plaintiff is an African–American male and the firing of Plaintiff by Defendant was clearly an adverse employment action. *See, e.g., Burlington Indus. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (firing is an adverse employment action); *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981) ("Disparate treatment theory as it has emerged … has consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating.").

At issue, then, are the last two factors: whether Plaintiff's job performance met the employer's legitimate expectations; and whether the termination of employment occurred under circumstances that support an inference of unlawful discrimination.

■ Whether or not Plaintiff's job performance met the employer's legitimate expectations may be a matter for debate. Plaintiff seems to have been performing well enough to secure a job promotion and a raise in September 2002. Plaintiff is, nevertheless, unable to advance proof that establishes that the termination of his employment occurred under circumstances that support an inference of unlawful discrimination. He is, therefore, unable to make a prima facie case of racial discrimination in the termination of his employment.

Although Plaintiff provides many examples of reasons that his job was frustrating and unpleasant, the circumstances that surround the termination of his employment—the only circumstances to which this court can give credence here—do not support an inference of unlawful discrimination. First, Plaintiff admits that he personally experienced no overt racism and that no one ever used any racial slurs. Dep. of Delon, vol. II, p. 20. Second, Plaintiff can identify no white workers who engaged in misconduct similar to his own but were retained instead of fired. When specifically asked to explain what, about his termination, demonstrated discrimination, Plaintiff answered: "Well, I felt like when I went in the office I brought out something that was of concern to everyone, and I went in the office and got fired because I said something about my supervisor who is white. And that's how I felt like I was discriminated against." *Id.* at 44.

Plaintiff does not establish a prima facie case of discrimination in the termination of his employment under Title VII or § 1981. Therefore, burden shifting need not even be considered. Plaintiff's claims regarding the termination of his employment under

Title VII and § 1981 cannot survive summary judgment as a matter of law.

### ii. Creation of a Hostile Work Environment in Violation of Title VII

In order to establish a prima facie claim that Plaintiff was subjected to a hostile work environment, Plaintiff must show that (1) he experienced unwelcome harassment; (2) the harassment was based on his gender, race, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir.1998)). This court does not even reach a discussion of the fourth element, whether or not there is some basis for imputing liability to the employer, because Plaintiff has not been able to demonstrate harassment based on his race that alters the conditions of his employment or creates an abusive atmosphere.

In his complaint, Plaintiff does not distinguish between the significance of his hostile working environment claim and his discriminatory termination of employment claim. Indeed, both are listed in Paragraph 37. Compl., ¶ 37. Plaintiff does allege specifically, however, that he and other African–American employees were discriminated against because they were "forced to work outside year around in the Winter cold without heat and in the Summer heat without air conditioning near an open foul smelling sewer line." *Id.* ¶ 15. Further, he alleges that a "hostile, racist, unsafe, unhealthy and abusive working environment" was created because Defendant "allow[ed] white supervisors to work in a climate controlled inside work environment" while "Plaintiff and other African[-] American workers [were forced] to work in a physically abusive, unhealthy and demoralizing discriminatory work environment."

*Id.* ¶ 28. This abuse, Plaintiff claims, was the "consequence of Defendant influencing UNC Hospitals to change the new valet parking booth … to an office for Diane Swearingen." *Id.* ¶ 21. Plaintiff also complains about having to stand, *see, e.g., id.* ¶ 33, and about the traffic problems and the backlog of customers, *see, e.g., id.* ¶ 16.

In addition to complaints about the working conditions suffered by the parking attendants, Plaintiff refers in his notebook to alleged incidents of racial favoritism being shown to white customers and racial discrimination being shown to customers who were not white. *See* Deposition Documents (September 6, 2002, September 19, 2002, September 26, 2002, October 3, 2002, and October 14, 2002). Plaintiff is specifically questioned about many of these incidents at his deposition. *See* Dep. of Delon, vol. I, pp. 82–83, 86–89, 133–35. Plaintiff testifies that he felt "embarrassed" when a Caucasian customer benefitted from an exception to a generally enforced parking policy, *id.* at 89, and that Defendant's treatment of an African–American customer whose car had been damaged "felt racist to myself [sic] and the other employees," *id.* at 135. Nevertheless, Plaintiff is never able to demonstrate that under similar circumstances, customers of different races were treated differently.

None of Plaintiff's complaints about physical working conditions are supported by any evidence that his frustrations were harassment based upon his race. There is no evidence that African–American valets were required to stand in the sun or cold (or near an open sewage line) while valets that were white were allowed the luxury of sitting in the shade or inside. Likewise, none of Plaintiff's complaints about the treatment of customers demonstrates that customers of different races received disparate treatment under similar circumstances. Furthermore, although Plaintiff

testifies to feeling embarrassed by what he perceived to be discriminatory treatment of customers, he does not show that this is evidence that he was being harassed based upon his race. There simply is not sufficient evidence that anything about which Plaintiff complains has to do with race. Plaintiff's hostile work environment claim under Title VII cannot survive summary judgment as a matter of law.

### b. Termination of Employment in Violation of REDA

■ The North Carolina legislature enacted REDA in order to provide workers with a method to remedy unsafe and illegal working conditions without being punished by their employer. *Brown v. Sears Auto. Ctr.*, 222 F.Supp.2d 757, 762 (M.D.N.C. 2002) (citing *Comm'r of Labor of North Carolina v. House of Raeford Farms, Inc.*, 124 N.C.App. 349, 356, 477 S.E.2d 230, 234 (1996)). REDA prohibits any retaliatory discrimination against an employee who files a complaint or initiates an inquiry under certain North Carolina statutes. In order to succeed on a REDA claim, a plaintiff must demonstrate that "retaliatory motive" for filing a complaint under one of these statutes "was a substantial factor in the adverse employment actions take by the defendant." *Wiley v. United Parcel Serv. Inc.*, 102 F.Supp.2d 643, 650 (M.D.N.C.1999). That a defendant would have terminated a plaintiff's employment even if the complaint had not been made is an affirmative defense to a REDA claim. *See* N.C. GEN. STAT. § 95–241(b) (It is not a violation of REDA to discharge an employee if a defendant can prove "by the greater weight of the evidence that it would have taken the same unfavorable action in the absence of the protected activity of the employee."); *Wilkerson v. Pilkington North Am. Inc.*, 211 F.Supp.2d 700, 706 (M.D.N.C.2002) (recognizing this affirmative defense).

In the case at hand, Plaintiff must demonstrate that the termination of his employment is causally connected to a protected complaint. Plaintiff cannot make such a demonstration. The complaint that Plaintiff made to Cowley was not one of the enumerated list that is protected under REDA. Rather, it was merely a complaint to a manager about a supervisor. Plaintiff's REDA claim cannot survive summary judgment as a matter of law.

### c. Wrongful Discharge

■ North Carolina is an at-will employment state and does not generally recognize wrongful discharge claims. *See United States ex rel. Phillips v. Pediatric Servs. of Am., Inc.*, 142 F.Supp.2d 717, 735 (W.D.N.C.2001) (quoting *Lorbacher v. Housing Auth. of City of Raleigh*, 127 N.C.App. 663, 672, 493 S.E.2d 74, 79 (1997) ("As a general rule in North Carolina, an employee-at-will has no claim for wrongful discharge.") (overruled in part on other grounds by *Riley v. Debaer*, 144 N.C.App. 357, 362, 547 S.E.2d 831, 835 (2001))). Although the general rule is that "an employee without a definite term of employment is an employee-at-will and may be discharged at any time without cause," *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 175, 381 S.E.2d 445, 446 (1989), an employer is somewhat constrained in its ability to terminate the employment of an employee, *Lorbacher*, 127 N.C.App. at 672, 493 S.E.2d at 79. North Carolina does, to that end, recognize a valid claim of wrongful discharge "when an at-will employee is discharged for an unlawful reason or in contravention of public policy." *Id.* (citing *Coman*, 325 N.C. at 175, 381 S.E.2d at 447). Termination of employment violates public policy if it "injure[s] the public or is against the public good." *Id.*

Nevertheless, North Carolina courts have consistently held that "[t]he public

policy exception to the employment-at-will doctrine is a 'narrow exception.' " *Roberts v. First–Citizens Bank,* 124 N.C.App. 713, 721, 478 S.E.2d 809, 814 (1996) (*quoting Williams v. Hillhaven Corp.,* 91 N.C.App. 35, 39, 370 S.E.2d 423, 425 (1988)). The Fourth Circuit has noted that "the only three successful wrongful discharge plaintiffs we find in reported North Carolina cases have had to choose between their jobs and violating the criminal law." *Harrison v. Edison Bros. Apparel Stores, Inc.,* 924 F.2d 530, 533 (4th Cir.1991). Thus, the circumstances in which plaintiffs have been successful in wrongful discharge claims are few and narrowly defined. *DeWitt v. Mecklenburg County,* 73 F.Supp.2d 589, 604 (W.D.N.C.1999) (citing *Coman,* 325 N.C. 172, 381 S.E.2d 445 (discharge of truck driver for refusing to falsify driver records to show compliance with federal transportation regulations offends federal and state public policy); *Amos v. Oakdale Knitting Co.,* 331 N.C. 348, 416 S.E.2d 166 (1992) (discharging an employee for refusing to work for less than minimum wage violated public policy); *Sides v. Duke Univ.,* 74 N.C.App. 331, 328 S.E.2d 818 (1985) (termination of nurse for refusal to testify falsely or incompletely in medical malpractice trial against employer hospital violates public policy against perjury), *overruled on other grounds, Kurtzman v. Applied Analytical Indus.,* 347 N.C. 329, 333, 493 S.E.2d 420, 423 (1997); *Vereen v. Holden,* 121 N.C.App. 779, 468 S.E.2d 471 (1996) (termination for engaging in political activity protected by the First Amendment violates public policy), *remanded on other grounds,* 345 N.C. 646, 483 S.E.2d 719 (1997), *and modified,* 127 N.C.App. 205, 487 S.E.2d 822 (1997); *Harrison v. Edison Bros. Apparel Stores, Inc.,* 924 F.2d 530 (4th Cir.1991) (discharge for refusal of supervisor's sexual advances violates public policy against prostitution)).

■ Plaintiff, an at-will employee in the state of North Carolina, seeks to persuade the court that his termination was against public policy and, therefore, a wrongful discharge. In his complaint, Plaintiff alleges specifically that "Plaintiff['s] complaints about his white supervisors were legitimate concerns for safety and traffic problems in front of UNC Hospitals, a North Carolina public institution," Compl., ¶ 44, and that "Plaintiff['s] complaints were of concerns to the public interest and public policy because the complaints were made to protect the safety of persons going to and from UNC Hospitals," *id.* ¶ 45. Although he strives to place his case in the middle of public policy concerns, Plaintiff's case cannot be likened to any of the narrowly defined circumstances in which a wrongful discharge claim has been allowed to proceed in North Carolina.

Whether or not Plaintiff ever did, or does now, maintain serious concerns for public safety it is clear that the termination of his employment by Defendant did not, itself, violate public policy. The uncontroverted evidence shows that Plaintiff did not make any administrative filings until after he was fired; that Plaintiff did not reveal the existence of his notebook until the day he was fired and, even then, did not turn over the contents of his notes; and that Plaintiff said at the time and in his deposition that he was afraid he would be fired for complaining about his supervisor. Moreover, as already noted, *supra* at 7, Eubanks declared that she has "never understood Plaintiff to claim that he made a health or safety complaint."

Although Plaintiff has recently filed a motion to submit evidence of illegal behavior to this court, nothing in the record demonstrates that Plaintiff made any effort to report any illegal activity to his supervisors or to any state or federal agency before his employment was terminated. In no case has a plaintiff been

permitted to recover for internal reporting of lawful behavior, which is all that can be established here. Plaintiff's wrongful discharge claim cannot survive summary judgment as a matter of law.

### III. Plaintiff's Motion to Admit Evidence

Because this court will recommend that summary judgment be granted in favor of Defendant on all of Plaintiff's claims, Plaintiff's motion to admit evidence of criminal acts of bribery, conspiracy, and obstruction of justice is mooted and no further discussion is required.

### IV. Defendant's Motions to Strike

Because this court will recommend that summary judgment be granted in favor of Defendant on all of Plaintiff's claims, Defendant's motions to strike are mooted.

### V. Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that Defendant's motion for summary judgment (docket no. 12) be **GRANTED**. The remaining motions (docket nos. 14, 15, & 19) from both parties are mooted and they are **DENIED AS MOOT**.