**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1456**

JUSTIN DRISKELL,

Plaintiff − Appellee,

v.

SUMMIT CONTRACTING GROUP, INC.,

Defendant – Appellant.

**No. 19-1497**

JUSTIN DRISKELL,

Plaintiff − Appellant,

v.

SUMMIT CONTRACTING GROUP, INC.,

Defendant – Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Frank D. Whitney, District Judge.  (3:16-cv-00819-FDW-DCK)

Argued:  May 28, 2020                          Decided:  September 24, 2020

Before DIAZ and THACKER, Circuit Judges, and TRAXLER, Senior Circuit Judge.

---

Affirmed in part, reversed in part, vacated in part, and remanded by unpublished opinion. Judge Diaz wrote the majority opinion, in which Judge Thacker joined. Senior Judge Traxler wrote a separate opinion concurring in part and dissenting in part.

---

**ARGUED:** Reginald Wayne Belcher, Columbia, South Carolina, Richard Taylor Speer, TURNER, PADGET, GRAHAM & LANEY, PA, Greenville, South Carolina, for Appellant/Cross-Appellee. Joshua Reed Van Kampen, Nicole Katherine Haynes, VAN KAMPEN LAW, PC, Charlotte, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Laura J. Wetsch, WINSLOW & WETSCH, PLLC, Raleigh, North Carolina, for Appellee/Cross-Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

In this case, a jury found that Summit Contracting Group violated North Carolina law by firing Justin Driskell as retaliation, either (1) for his complaints about workplace safety or (2) because Summit believed that he would file a workers' compensation claim. Summit appeals, arguing that it was entitled to judgment as a matter of law or a new trial, and that the jury's punitive-damages award wasn't supported by the evidence. Driskell cross-appeals, contending that the district court erred by not increasing the jury's compensatory damages award to reflect the full amount of back pay that he's owed and by requiring him to elect between punitive damages and attorney's fees.

We affirm with respect to Summit's appeal because a reasonable jury could have found for Driskell on the merits and awarded him punitive damages. With respect to Driskell's cross-appeal, we hold that he failed to preserve his back-pay request for appellate review by not raising it before the district court in a timely fashion. However, we reverse the district court's order requiring Driskell to elect between punitive damages and attorney's fees, as the two awards serve different interests and aren't based on the same conduct. We vacate that portion of the judgment, and remand for the district court to enter judgment for Driskell for punitive damages, attorney's fees, and untrebled compensatory damages.

I.

This appeal arises from a motion for judgment as a matter of law, so we recite the facts with all reasonable inferences drawn in favor of the non-movant, Driskell. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727 (4th Cir. 1999).

A.

Summit is a general contractor that manages construction projects. On June 4, 2015, Summit hired Driskell as an Assistant Superintendent and promptly assigned him to a project in Charlotte, North Carolina. He reported to Superintendent Daniel Rhyner, who in turn reported to the Project Manager, Steve Fudge. Driskell's father, Tom Driskell, had been a senior Summit employee for years.

In June and July 2015, Driskell noticed that Rhyner frequently drank alcohol at lunch and returned to work intoxicated, occasionally acting belligerently. One day, Rhyner drunkenly brandished a handgun at the job site. Summit's policies prohibit visiting a job site after drinking or while carrying a gun.

Driskell reported Rhyner's drinking to more senior employees several times. During his first week at the Charlotte project, he complained to Fudge that it was a safety issue. Fudge relayed this complaint to Marc Padgett, Summit's president and chief executive officer. Tom Driskell also relayed his son's complaints to Padgett's wife, Nicole Padgett, who was Summit's chief administrative officer. The Padgetts, however, suspected that the Driskells were scheming to file a "bogus lawsuit" against Summit. J.A. 1648.

On the night of July 16, 2015, Justin Driskell ran into Rhyner, who was drunk, in the parking lot of a hotel where many employees were staying. They argued about a

4

workplace safety issue, at which point Rhyner angrily told Driskell to pack his things and leave the job site.

Later that night, Driskell spoke with Mr. Padgett on the phone and complained again about Rhyner's drinking on the job. Padgett told Driskell to disregard what Rhyner had said about leaving the job site and that he would send a senior employee, Tom Born, to Charlotte to investigate Driskell's complaints. After the call, Rhyner apologized to Driskell. Mr. Padgett also alerted Rhyner that Born was coming to investigate the Driskells' allegations about his drinking.

On July 18, Born met with Rhyner and told him that the Driskells had complained about him. Born also asked a few employees whether they had seen Rhyner drink at the job site, which none of them had. He didn't test Rhyner for drugs or alcohol, check his company credit card receipts (which reflected purchases of alcohol), or ask anyone if they had seen Rhyner drink at lunch, as Driskell had alleged.

Born then met with Driskell. He asked no questions about Rhyner's drinking. Instead, he told Driskell to stop telling people what was going on at the job site, and that whatever happened at the job site should stay there. Born then took Rhyner and other employees (but not Driskell) out to lunch, buying Rhyner two beers. This wasn't a violation of company rules because Rhyner wasn't going back to work after lunch.

The next day, Born sent a report to Mr. Padgett, concluding that Driskell was "a good kid" but needed to "grow a pair of balls." J.A. 2585. Mr. Padgett agreed.

The day after that (July 20), Driskell saw Rhyner, who appeared drunk, in the hotel parking lot. At Rhyner's insistence, the two had a beer together. Rhyner then said that he

was removing some employees from the team that Driskell supervised, and that Driskell's team needed to increase its production (even though it would have fewer members). In response, Driskell said that pushing his team any harder would create safety issues. The two argued about this and cursed each other.

According to Driskell and an eyewitness, Driskell then turned toward his truck to leave. Rhyner followed him and punched him in the face repeatedly. Driskell didn't throw a punch, but wrestled with Rhyner, threw him over his head, and put him in a headlock. Neither party was hurt seriously, although Rhyner had to wear a neck brace for two weeks. During the fight, Rhyner told Driskell, "You're fired." J.A. 1073.

Later that evening, Driskell spoke to Mr. Padgett on the phone. Padgett told Driskell that he wasn't fired and that Rhyner lacked the authority to fire him. Driskell replied that he would quit if Rhyner remained at Summit.[1] Padgett didn't respond to that threat. Driskell also met with Fudge that night, who asked Driskell to return his work tools. Driskell expressed confusion about why he had to do that, as he planned to continue working at Summit, but he ultimately complied.

That same night, Driskell filed a criminal complaint against Rhyner—even though Fudge and Padgett had discouraged him from doing so—which led the police to charge

---

[1] Rhyner drove to his home in Tennessee that night and told his superiors that he was taking two weeks of paid time off. He remained employed by Summit when this lawsuit was filed.

6

Rhyner with assault.[2]  Driskell also visited the emergency room for medical treatment.  The doctor examining him said that he could return to work three days later (July 23).

The next morning, Mrs. Padgett emailed her husband and several other employees, writing: "We need to find out what steps to take next because Tom and Justin [Driskell] are plotting a bogus lawsuit that I sniffed out almost two weeks ago.  This whole thing was planned."  J.A. 2699.  She later followed up to write that Tom Driskell "orchestrated this entire scam" with "the intent to screw Marc [Padgett] out of 5 MIL . . . ."  J.A. 2698.

Driskell took the next two days off and drove to Columbia, South Carolina, where his father lived and where Summit had another work site.  He planned to return to work on July 23, but wasn't sure which work site he should report to, as he had been receiving "conflicting information" (presumably from his father) on this point.  J.A. 1095.  Driskell had no paid or unpaid leave time available, so if he was still employed by Summit on July 21 and 22, he was breaking the company's rules by missing work.

Over those two days, Driskell called and texted Fudge repeatedly, seeking clarity on where he should report to work.  Fudge didn't answer.  On July 22 at 3:37 p.m., Driskell emailed Fudge and Mr. Padgett, saying: "Steve you have refused my calls and text message[s.]  [A]fter tomorrow my [doctor] has cleared me to go back to work[,] please advise what I'm suppose[d] to do."  J.A. 2703 (cleaned up).  Padgett promptly forwarded this message to his wife, who started a group email thread that included her husband, Born, and Zach Graham (another employee).

---

[2] The charges against Rhyner were eventually dismissed at Driskell's request.

7

At 4:23 p.m. on July 22, Mrs. Padgett explained in the group thread that she told Fudge not to respond to Driskell "before we knew the plan from the attorney." J.A. 2702. The next day, the group debated via email which of them should "give [Driskell] the boot." J.A. 2702. Born wrote, "I think Zach was the designated terminator because Steve and I would have personal motivations to Fire [sic] him . . ." J.A. 2701. Fudge also noted that Driskell still had his company phone and iPad, and asked Graham to collect Driskell's devices. But notwithstanding this conversation, no Summit employee (except for Rhyner back on July 20) ever told Driskell that he was fired.

Driskell's company-issued phone and iPad were deactivated on July 22, shortly after he had emailed Fudge and Mr. Padgett. At trial, he testified that he "knew at that point that [he] had been terminated and that it was not going to be reversed." J.A. 1216. Nevertheless, he texted Fudge the following message from his personal phone later that evening: "Still haven't heard any word as to what you need me to do. Please give me a call." J.A. 2706. Fudge never responded.

The next afternoon (July 23), Driskell turned in his company-issued devices at the Columbia job site. He explained at trial that he did so because he "knew . . . that [he] had been fired and that if [he] kept company property that [he] could be prosecuted for theft." J.A. 1098.

About a month later, Driskell applied for a new job at another company. On the application, he checked a box indicating that he had never been "fired from a job." J.A. 1204. At trial, Driskell explained that this was a lie to improve his chances of getting the new job.

8

B.

In January 2016, Driskell filed a complaint with the North Carolina Department of Labor. He alleged that he was fired because of his complaints about Rhyner and his refusal (for safety reasons) to follow Rhyner's instructions to increase his team's production, and because he "became a threat, risk or liability to the Company after Mr. Rhyner attacked [him]." J.A. 78. After the Labor Department declined to investigate his complaint, Driskell asked for and received a right-to-sue letter.

Driskell then filed this suit, bringing claims for, as relevant here, retaliatory termination in violation of North Carolina's Retaliatory Employment Discrimination Act ("REDA") and wrongful discharge in violation of North Carolina common law. He alleged two theories for why Summit fired him: (1) because of his complaints about Rhyner's drinking and their fight, and (2) because Summit believed that he would file a workers' compensation claim due to his injuries from his fight with Rhyner.

Discovery yielded evidence that Summit has exhibited hostility toward other workplace safety reports and workers' compensation claims. For example, Mrs. Padgett once complained about having to document a workplace accident; she instructed employees to put medical bills on company credit cards rather than open workers' compensation claims; and Summit would screen potential employees for their workers' compensation claim history.

A jury trial ensued. The jury found that Summit had fired Driskell and, in doing so, violated REDA and North Carolina common law. The jury didn't specify which of Driskell's two theories of retaliation it accepted. It also awarded Driskell $65,000 in

9

compensatory damages (representing his lost wages and benefits) for his two claims (which he could collect only once) and $681,000 in punitive damages on the wrongful-discharge claim.

The district court denied Summit's motions for judgment as a matter of law and for a new trial, in which Summit argued that the verdict was unsupported by the evidence and criticized the court's jury instructions regarding the types of activity that REDA protects. Further, the court denied Driskell's motion to amend the judgment without addressing Driskell's request that the court increase his compensatory award to reflect additional lost back pay. Driskell hadn't included this request in his motion to amend the judgment (which he had filed in a timely fashion), but rather in a response to one of Summit's motions, which Driskell filed 38 days after the judgment was entered.

Later, the court held that Driskell was required to choose between a $250,000 punitive-damages award[3] for the wrongful-discharge claim and attorney's fees under REDA.[4] The court reasoned that North Carolina law prevents duplicative remedies, *see United Labs., Inc. v. Kuykendall*, 437 S.E.2d 374, 379 (N.C. 1993), and that the award of

---

[3] The court reduced the punitive-damages award to $250,000 because, as Driskell conceded, that was the maximum that he could collect under N.C. Gen. Stat. § 1D-25(b), which provides that "[p]unitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater."

[4] REDA provides that a "court may award to the plaintiff and assess against the defendant the reasonable costs and expenses, including attorney's fees, of the plaintiff in bringing an action pursuant to this section." N.C. Gen. Stat. § 95-243(c).

punitive damages and attorney's fees were based on the same conduct (namely, Summit's retaliatory firing). Driskell then chose to forgo punitive damages, collecting $195,000 in trebled compensatory damages[5] and $441,600 in attorney's fees.

Both parties appealed.

## II.

We first address Summit's appeal, which raises several issues of North Carolina law. In ruling on these issues, we must predict how the Supreme Court of North Carolina would rule, *Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016), and follow any "fully reasoned holding" by the North Carolina Court of Appeals unless we are "convinced that the state's highest court would not follow that holding," *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1003 (4th Cir. 1998) (cleaned up).

## A.

First, Summit insists that it was entitled to judgment as a matter of law on Driskell's REDA and wrongful-discharge claims because it never fired him; rather, he quit. We must

---

[5] REDA requires a court to treble a plaintiff's compensatory damages if the defendant's violation was "willful," i.e., if it involved "knowledge or reckless disregard of whether [the defendant's] action violated the statute." *Morris v. Scenera Research, LLC*, 788 S.E.2d 154, 161 (N.C. 2016) (citing N.C. Gen. Stat. § 95-243(c)). The district court, not a jury, must make this determination. *See id.* Driskell conceded that he was required to choose between punitive and trebled damages. He sought to recover $250,000 in punitive damages, $65,000 in untrebled compensatory damages, and $441,600 in attorney's fees. But after the district court held that he couldn't collect both punitive damages and attorney's fees, he elected to recover treble damages and attorney's fees in lieu of punitive damages.

11

affirm the district court unless no reasonable jury could have ruled for Driskell. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

As relevant here, REDA provides that:

> No person shall discriminate or take any retaliatory action against an employee because the employee in good faith does or threatens to . . . [f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to [the Occupational Safety and Health Act of North Carolina ("OSHANC") or the North Carolina Workers' Compensation Act].

N.C. Gen. Stat. § 95-241(a). To prevail on a REDA claim, a plaintiff must show that (1) he exercised his right to engage in protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between his exercise of the protected activity and the retaliatory action. *Edwards v. PCS Phosphate Co.*, Inc., 812 F. Supp. 2d 689, 693 (E.D.N.C. 2011) (citing *Brackett v. SGL Carbon Corp.*, 580 S.E.2d 757, 762 (N.C. Ct. App. 2003)). And a wrongful-discharge claim requires a plaintiff to "identify a specified North Carolina public policy"—here, the policy against retaliation codified in REDA—"that was violated by an employer in discharging the employee." *McDonnell v. Guilford County Tradewind Airlines, Inc.*, 670 S.E.2d 302, 305 (N.C. Ct. App. 2009) (cleaned up).

As an initial matter, we note that North Carolina law provides no legal standard for determining whether an employee was fired or quit. Relatedly, we have found no authority requiring that an employer expressly tell an employee that he's been fired.

With that in mind, we conclude that the evidence supports a finding that Summit fired Driskell on either July 22 or July 23, 2015. Most significantly, Summit deactivated

12

Driskell's work-issued devices on July 22. Fudge and Padgett also didn't respond to Driskell's attempts to contact them on July 21 or 22, and Fudge had asked Driskell to return his work tools on the night of July 20. And when Driskell returned his work-issued devices on July 23, no one directed him to continue working at Summit or told him that Summit mistakenly deactivated his devices. A reasonable person in Driskell's position would have understood that he had been terminated, and Summit's internal emails on July 22 and 23 prove that it did in fact intend to terminate Driskell, despite Padgett's statement on July 20 that Driskell wasn't fired.

At no point did Driskell quit his job. While he did tell Mr. Padgett on July 20 that he *would* quit if Rhyner remained employed by Summit, threatening to quit and actually doing it are two different things. And while he also broke Summit's rules by missing work on July 21 and 22, he did so only because his doctor told him to, and in any event, breaking an employer's rules doesn't necessarily signify an intent to quit. Indeed, Rhyner violated Summit's rules by taking two weeks off from work after his fight with Driskell, and yet he received no punishment and continues to work for Summit.

Nor does Driskell's statement on a job application that he had never been fired doom his claims. To the contrary, a reasonable jury could credit his explanation that he lied to help his chances of getting a new job. Statements on job applications aren't binding admissions, contrary to what Summit argues. The case Summit points to, *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510 (4th Cir. 2006), doesn't support that proposition. There, in ruling against a plaintiff, we relied on the plaintiff's "fail[ure] to present any evidence

13

genuinely disputing" the fact that he had admitted in a job application. *Id.* at 519. Here, Driskell did present such evidence.

B.

Next, Summit contends that REDA doesn't protect internal complaints to one's own employer. So, Summit argues that it is entitled to judgment as a matter of law because, even if Summit did fire Driskell for his complaints to Mr. Padgett, that couldn't support a REDA claim.

Whether REDA protects Driskell's complaints is a question of law, *see Pierce v. Atlantic Grp., Inc.*, 724 S.E.2d 568, 573–75 (N.C. Ct. App. 2012) (treating as a legal question whether REDA protected a plaintiff's communications with his supervisors regarding work safety issues), which we review de novo, *see Equinor USA Onshore Properties Inc. v. Pine Res., LLC*, 917 F.3d 807, 813 (4th Cir. 2019). We agree with the district court that, while REDA doesn't protect *every* internal complaint about workplace safety, it does protect Driskell's complaints to Mr. Padgett.

By its terms, REDA protects employees who "initiate any inquiry [or] investigation . . . or provide information to any person with respect to" OSHANC. N.C. Gen. Stat. § 95-241(a). "The Supreme Court of North Carolina has not ruled whether an internal complaint is a protected activity under REDA." *Hadley v. Duke Energy Progress, LLC*, 677 F. App'x 859, 861 (4th Cir. 2017) (per curiam).

The Court of Appeals of North Carolina, however, has indicated that some internal complaints *are* protected. In *Pierce*, the court found "persuasive" a district court holding that REDA protected a plaintiff's communications to an internal auditor about an ongoing

14

investigation into health and safety practices. 724 S.E.2d at 574–75 (citing *Jurrissen v. Keystone Foods, LLC*, No. 1:08-CV-128, 2008 WL 3925086, at \*5–6 (M.D.N.C. Aug. 20, 2008)).

And in a later case, the Court of Appeals found that REDA would protect plaintiffs who were allegedly fired for photographing unsafe working conditions and complaining about those conditions to their boss, who replied that he wasn't interested in such complaints. *Bigelow v. Town of Chapel Hill*, 745 S.E.2d 316, 324 (N.C. Ct. App. 2013). The court reasoned that REDA's "primary purpose . . . is to ensure that employees are not discouraged from reporting violations of OSHANC." *Id.* at 325 (cleaned up).

On the flip side, the Court of Appeals has also recognized "that merely talking to an internal supervisor about potential safety concerns is not a 'protected activity' under REDA." *Pierce*, 724 S.E.2d at 574 (quoting *Jurrissen*, 2008 WL 3925086, at \*5). For instance, the plaintiff in *Pierce* proposed to his supervisors a process by which the company might comply with new safety regulations, raising it on a weekly basis for about a month without ever getting a response. *Id.* at 571.

The Court of Appeals found that such activity was not protected because the plaintiff "spoke only to his supervisors" and "there was no evidence of an investigation" into the defendant's practices. *See id.* at 575; *see also Hadley*, 677 F. App'x at 862 (noting *Pierce*'s recognition that "while REDA does not require filing a formal claim, it does require more than simply complaining to a manager"). While the Court of Appeals didn't explain why it mattered that the plaintiff spoke only to his supervisors, we suspect that it's because employees do that in the ordinary course. An employee who mentions an OSHANC issue

15

to a supervisor won't typically be seeking to assist or initiate an "inquiry" or "investigation," which is what REDA protects, N.C. Gen. Stat. § 95-241(a). In contrast, an employee who goes over a supervisor's head and complains to the company president or an internal auditor will typically intend to assist or initiate an inquiry or investigation. *See Jurrissen*, 2008 WL 3925086, at *6 (finding that the plaintiff's communication with an internal auditor was protected by REDA, even though "merely commenting to a supervisor about alleged unsafe conditions" would not be).

The Court of Appeals also cited approvingly a district court's holding "that a plaintiff's criticism of his supervisor to a division manager" wasn't protected. *Pierce*, 724 S.E.2d at 575 (citing *Delon v. McLaurin Parking Co.,* 367 F. Supp. 2d 893, 902 (M.D.N.C. 2005), *aff'd,* 146 F. App'x 655 (4th Cir. 2005)). In that case, the plaintiff's criticism of his supervisor was largely unrelated to workplace safety. *See Delon*, 367 F. Supp. 2d at 896–98 (noting that the plaintiff kept a notebook of complaints that "cover[ed] a wide range of topics," most of which didn't concern safety, and that his criticism was focused on the supervisor's management and not any "concern over safety issues").

We deduce from these authorities the following principles. Internal complaints alleging ongoing OSHANC violations, like the ones in *Bigelow* and *Jurrissen* (and unlike the one in *Pierce*, where the plaintiff proposed a way to comply with new safety rules but didn't allege any ongoing violations), can be protected. In assessing whether a particular complaint is protected, we should also consider: whether it relates or leads to an investigation, *see Pierce*, 724 S.E.2d at 575; whether it's made to someone other than the plaintiff's "supervisors or managers," *see id.*; and whether workplace safety is a primary

16

focus of the complaint, *see Delon*, 367 F. Supp. 2d at 902 (finding that criticism of a supervisor that was mostly unrelated to workplace safety issues wasn't protected by REDA).

Driskell's complaints about Rhyner meet these criteria. Driskell alleged OSHANC violations: namely, Rhyner's presence at the work site while intoxicated and his assault on Driskell. *See* N.C. Gen. Stat. § 95–129(1) (requiring employees to furnish "a place of employment free from recognized hazards that are causing or are likely to cause death or serious injury or serious physical harm to [] employees"). These allegations led to Born's investigation into Rhyner's drinking. Driskell complained frequently to Mr. Padgett, who is Summit's president and chief executive officer, not a mere supervisor or manager. And workplace safety was the focus of Driskell's complaints. Thus, REDA protects Driskell's complaints to Mr. Padgett.

## C.

Summit also makes two arguments that are specific to Driskell's second theory of retaliation: namely, that Summit expected Driskell to file a workers' compensation claim. While Driskell's first theory suffices to support the jury's verdict on the merits (and its compensatory-damages award), we address the second theory as well because it's relevant to evaluating Summit's challenge to the punitive-damages award.

## 1.

First, Summit assails the district court's jury instruction that "[i]t is against the law for an employer to terminate an employee because the employer *believes* the employee will file a workers' compensation claim against the employer." J.A. 1932 (emphasis added).

17

In Summit's view, REDA's text requires an employee to actually file or "threaten[] to" file a workers' compensation claim, *see* N.C. Gen. Stat. § 95-241(a). Because Driskell never explicitly threatened to file a claim, Summit insists, his second theory of retaliation shouldn't have been submitted to the jury. Whether the jury instruction was correct is another question of law that we review de novo.

We conclude that the jury instruction was correct, as no explicit threat by the plaintiff is required. In *Abels v. Renfro Corp.*, the Supreme Court of North Carolina construed REDA's predecessor statute—whose language was much narrower than REDA's[6]—to prohibit an employer from firing someone because the employer "anticipated her good-faith filing of a workers' compensation claim." 436 S.E.2d 822, 826 (N.C. 1993).

The plaintiff in *Abels* didn't threaten to file a claim. *See id.* at 826. Rather, the employer was aware that she had suffered an injury and that her doctor had requested that she be given a leave of absence. Upon learning that, the employer discharged her "to forestall the anticipated filing of a workers' compensation claim." *Id.* That was enough, the Supreme Court held, to support the jury's verdict for the plaintiff. *Id.*

---

[6] The predecessor statute read in pertinent part: "(a) No employer may discharge or demote any employee because the employee has instituted or caused to be instituted, in good faith, any proceeding under the North Carolina Workers' Compensation Act, or has testified or is about to testify in any such proceeding." N.C. Gen. Stat. § 97-6.1 (1991). REDA's text is much broader, covering anyone who "threatens to" file a workers' compensation claim. N.C. Gen. Stat. § 95-241(a).

The only difference between the *Abels* standard and the jury instruction in this case is that the district court substituted "believe" for "anticipate." This difference is immaterial. The two words are analogous in that (1) they relate to the defendant's subjective expectation and (2) neither requires the plaintiff to have explicitly threatened to file a claim. And REDA was meant to expand its predecessor's protections, not narrow them. *Cf. Johnson v. Trs. of Durham Tech. Cmty. Coll.*, 535 S.E.2d 357, 361 (N.C. Ct. App. 2000) (explaining that REDA replaced the statute at issue in *Abels* and "expanded the definition of retaliation to include" many types of adverse employment actions, not just discharge and demotion). So, we must interpret REDA to prevent an employer from firing an individual because it anticipates (or believes) that she will file a workers' compensation claim. The jury instruction was therefore proper.

2.

Additionally, Summit asserts that Driskell failed to exhaust his administrative remedies as to his workers' compensation theory because he didn't raise that theory in his complaint to the North Carolina Department of Labor, relying instead on his OSHANC theory. We disagree.

Before bringing a REDA claim, a plaintiff must: "file a written complaint with the Commissioner of Labor alleging [a REDA] violation," N.C. Gen. Stat. § 95-242(a); obtain a right-to-sue letter, *id.* §§ 95-242(a), 95-243(a); and commence a civil action within ninety days of the letter's issuance, *id.* § 95-243(b). Driskell did that, so he exhausted his administrative remedies. Since North Carolina law doesn't require that a REDA suit be based on the same theory of retaliation that supported the plaintiff's administrative

19

complaint, Summit's argument misses the mark. *See id.* § 95-243 (containing no such requirement).[7]

### D.

Next, Summit maintains that no reasonable jury could have found causation, i.e., that Summit fired Driskell because of his complaints or because it believed that he would file a worker's compensation claim. Instead, Summit posits, it fired Driskell for a legitimate reason: his violations of company policy, including insubordination, cursing and fighting his supervisor, and taking two days off when he had no leave available.

Summit is wrong. There was ample evidence to support causation with respect to both of Driskell's retaliation theories, including: Summit's internal emails strategizing about how to fire Driskell so as to avoid the appearance of illegality; the Padgetts' characterization of his complaints as a "scam," J.A. 2698, and as preparation for a "bogus lawsuit," J.A. 2699; Born's lackluster investigation of Driskell's complaints and comment that he needed to "grow a pair of balls," with which Mr. Padgett agreed, J.A. 2585; Summit's failure to punish Rhyner for fighting with Driskell; and Mrs. Padgett's general hostility toward OSHANC accident reports and workers' compensation claims.

Indeed, the evidence of causation here is stronger than in *Abels*, where the Supreme Court of North Carolina held that the record supported an inference of retaliation. 436 S.E.2d at 826. There, the plaintiff showed only that she was a good employee and that she

---

[7] In any event, Driskell arguably raised his workers' compensation theory in his complaint by stating that he was fired because he "became a threat, risk or liability to the company after Mr. Rhyner attacked [him]." J.A. 78.

was discharged shortly after her employer learned of her injury. *See Abels v. Renfro Corp.*, 423 S.E.2d 479, 483–84 (N.C. Ct. App. 1992) (summarizing the plaintiff's evidence), *aff'd in part and rev'd in part on other grounds*, 436 S.E.2d 822 (N.C. 1993). In contrast, Driskell presented direct evidence of retaliatory animus.

There's also no contemporaneous evidence corroborating Summit's explanation for why it fired Driskell. Thus, a reasonable jury "could infer from the late appearance of [Summit's] current justification that it is a post-hoc rationale, not a legitimate explanation for [its adverse employment] decision." *EEOC v. Sears Roebuck and Co.*, 243 F.3d 846, 853 (4th Cir. 2001).

## E.

Next, Summit asserts that it was entitled to judgment on Driskell's wrongful-discharge claim because Driskell never filed or threatened to file an OSHA or workers' compensation claim. Summit is mistaken.

As Summit recognizes, Driskell's "wrongful termination claim rises or falls on the viability of [his] REDA-based claim." *Lockie v. Staples Contract & Com., Inc.*, No. 3:14-CV-521, 2015 WL 93643, at *3 (W.D.N.C. Jan. 7, 2015). This is because "wrongful discharge claims have been recognized in North Carolina where the employee was discharged . . . for engaging in a legally protected activity," like complaining about OSHANC violations. *Combs v. City Elec. Supply Co.*, 690 S.E.2d 719, 723 (N.C. Ct. App. 2010) (cleaned up). Thus, just as we affirm the verdict for Driskell on his REDA claim, so too do we affirm the verdict on his wrongful-discharge claim.

## F.

21

Finally, Summit asserts that the jury's award of punitive damages for Driskell's wrongful-discharge claim wasn't supported by the record. We disagree.

Punitive damages are available in wrongful-discharge claims under North Carolina law. *See Roberts v. First-Citizens Bank and Trust Co.*, 478 S.E.2d 809, 810, 815 (N.C. Ct. App. 1996) (affirming punitive-damages award). They're only proper, however, where there's "clear and convincing evidence" that the defendant's conduct involved fraud, malice, or willful or wanton conduct. *Scarborough v. Dillard's, Inc.*, 693 S.E.2d 640, 644 (N.C. 2009) (citing N.C. Gen. Stat. § 1D–15(a)).

"Malice" in this context means "a sense of personal ill will toward the claimant that activated or incited the defendant to perform the act or undertake the conduct that resulted in harm to the claimant." N.C. Gen. Stat. § 1D-5(5). "Willful or wanton conduct" is defined as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." *Id.* § 1D–5(7)). It "means more than gross negligence." *Id.* And, "[w]hen punitive damages are sought against a corporation, the claimant must further show that 'the officers, directors, or managers of the corporation participated in or condoned the conduct [involving fraud, malice, or willful or wanton conduct] giving rise to punitive damages.'" *Id.* (citing N.C. Gen. Stat. § 1D–15(c)).

"The clear and convincing standard requires evidence that should fully convince." *Scarborough*, 693 S.E.2d at 643 (cleaned up). "This burden is more exacting than the 'preponderance of the evidence' standard generally applied in civil cases, but less than the 'beyond a reasonable doubt' standard applied in criminal matters." *Id.* In reviewing a

22

jury's punitive damages award, we must determine whether "a jury could reasonably find" that the claimant met this exacting burden. *Id.* at 644.

Here, a reasonable jury could be fully convinced that, in firing Driskell, Summit's executives (namely, the Padgetts) acted with malice toward Driskell or with a conscious disregard for his right to engage in activity protected by REDA. As for malice, Mrs. Padgett's emails about Driskell bespeak ill will toward him. She referred to his injuries as a "joke," J.A. 1631, and repeatedly accused him and his father of orchestrating a "scam," J.A. 2698, and a "bogus lawsuit," J.A. 2699. A jury could also find that the Padgetts' refusal to seriously investigate Driskell's allegations or punish Rhyner for assaulting Driskell reflected animus toward Driskell. Further, both of the Padgetts were on an email chain in which Born acknowledged that he and Fudge "would have personal motivations to [f]ire" Driskell, J.A. 2701, suggesting that the Padgetts may have "condoned [] conduct" involving malice, *see* N.C. Gen. Stat. § 1D-15(c).

The same evidence supports a finding of willful or wanton conduct. So too does Mr. Padgett's agreement with Born's view that Driskell needed to "grow a pair of balls" and stop complaining about Rhyner's drinking. J.A. 2585. That statement shows a conscious disregard for Driskell's right to allege an OSHANC violation. Similarly, Mrs. Padgett's hostility toward accident reports and workers' compensation claims indicates an indifference to the rights and safety of others.

In sum, while the clear-and-convincing standard is "exacting," *Scarborough*, 693 S.E.2d at 643, a reasonable jury could find that Driskell met it.

23

III.

We turn now to Driskell's cross-appeal, which raises two issues.

A.

First, Driskell argues that the district court erred by not amending the jury's award of $65,000 in compensatory damages. In his view, the award should have been $134,038 (before trebling), reflecting the full amount of back pay that he was owed.

Driskell failed to preserve this issue in the district court, however. Motions to amend a judgment "must be filed no later than 28 days after the entry of the judgment," Fed. R. Civ. P. 59(e), and a court may not extend that deadline, Fed. R. Civ. P. 6(b)(2). Driskell filed his back-pay request 38 days after the judgment was entered (in a response to one of Summit's motions) rendering the request untimely and thereby forfeiting appellate review of this issue. *See Alston v. MCI Commc'ns Corp.*, 84 F.3d 705, 706 (4th Cir. 1996) (dismissing an appeal because the appellant had failed to file a post-trial motion within the requisite time period); *see also Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 160 (4th Cir. 2012) ("Belk's failure to move pursuant to Rule 50(b) forfeits the sufficiency of the evidence challenge on appeal.").

B.

Driskell also insists that he shouldn't have been required to choose between the punitive-damages verdict (which arose from his wrongful-discharge claim) and the award of attorney's fees (which arose from his REDA claim). We agree.

Under North Carolina's "doctrine of election of remedies," "a plaintiff may not recover inconsistent remedies" or ones that would provide "double redress for a single

24

wrong." *United Labs.*, 437 S.E.2d at 379 (cleaned up). Punitive damages and attorney's

fees are not inconsistent remedies. *Id.* Whether they are duplicative turns on whether they

"serve different interests and are not based on the same conduct." *Id.* at 380.[8]

Without question, the two awards serve "wholly different" interests. *Id.*; *accord*

*Lacey v. Kirk*, 767 S.E.2d 632, 650 (N.C. Ct. App. 2014). "Punitive damages are designed

to punish willful conduct and to deter others from committing similar acts," *United Labs.,*

437 S.E.2d at 380, while "an award of attorneys' fees is intended to address costs that arise

in the course of the litigation of a particular case," *Lacey*, 767 S.E.2d at 650. And although

REDA doesn't explain *why* it authorizes fee awards for plaintiffs, we infer that it does so

"to encourage private enforcement of" its ban on discriminatory and retaliatory

employment practices, not to punish defendants. *See United Labs.*, 437 S.E.2d at 380

---

[8] Our dissenting colleague would hold that N.C. Gen. Stat. § 1D-20 effectively overruled *United Labs'* "mix-and-match approach" and thus blocks Driskell from recovering both awards. Dissent at 31. But that provision—which was enacted in 1995 in an act establishing standards for punitive damages, N.C. Sess. Laws 1995-514, H.B. 729, and has never been construed to apply to attorney's fees—requires claimants to elect "between punitive damages and any other remedy pursuant to another statute that provides for multiple damages." N.C. Gen. Stat. § 1D-20. It's true that Driskell's request for attorney's fees is "pursuant to" REDA, which provides for treble damages. But we think it doubtful that the Supreme Court of North Carolina would hold that REDA's separate allowance for an award of attorney's fees is a "remedy" in the way that § 1D-20 uses that term. After all, § 1D-20's title is "Election of extracompensatory remedies," and attorney's fees are strictly compensatory in that they reimburse a prevailing plaintiff's costs. The title of a statutory subsection, while "not controlling, [] does shed some light on the legislative intent underlying the enactment of that provision." *State v. Fletcher*, 807 S.E.2d 528, 539 (N.C. 2017). And that light is (we think) sufficient here to reject the dissent's view.

(explaining why a statute banning unfair methods of competition authorized awards of attorney's fees for successful plaintiffs) (cleaned up).

Further, (and contrary to the dissent's view) the two awards "are not based on the same conduct." *Id.* To recover punitive damages, Driskell had to prove that Summit's conduct involved fraud, malice, or willful or wanton conduct. *See* N.C. Gen. Stat. § 1D–15(a). In contrast, REDA gives the trial court discretion to award fees and costs to a prevailing plaintiff—irrespective of the defendant's conduct—provided the plaintiff can show that such fees and costs are reasonable. N.C. Gen. Stat. § 95-243(c). And while North Carolina courts have had little occasion to apply this standard in the context of REDA claims, we think the familiar test for reasonableness applied elsewhere governs here.[9] *See United Labs.*, 437 S.E.2d at 381-82 (directing trial court, in considering the reasonableness of a fee award for a plaintiff prevailing on a unfair competition claim, to make findings "as to the time and labor expended, the skill required, the customary fee for like work, the experience or ability of the attorney, the novelty and difficulty of the

---

[9] The district court mistakenly applied the federal lodestar standard in calculating a fee award. We have held (albeit in an unpublished opinion) that state law, not the federal lodestar test, should control in in this circumstance. *See Peter Farrell Supercars, Inc. v. Monsen*, 82 F. App'x 293, 300 (4th Cir. 2003) ("Because the district court granted fees pursuant to a Virginia statute, we look to Virginia's standards for determining if the fee award is reasonable."). Other circuits agree that when state law supplies the law of decision in a diversity case, state law also controls both whether to award reasonable attorney's fees and what standard to apply in calculating that award. *See* 17A Moore's Federal Practice-Civil § 124.07(3)(b) (2020) (citing opinions from the 1st, 2d, 3d, 5th, 6th, 7th, 8th, 9th, 10th, and 11th Circuits standing for this proposition). But because Summit raises no issue on appeal as to the reasonableness of the attorney's fee award, we do not address it further.

26

questions of law, the adequacy of the representation, the difficulty of the problems faced by the attorney, especially any unusual difficulties, and the kind of case for which the fees are sought and the result obtained.") (cleaned up).

In sum, because recovery of attorney's fees under REDA requires proof different from that which gives rise to punitive damages, and the awards don't arise from the same course of conduct, Driskell can collect both. The district court erred in holding otherwise.

IV.

For the reasons given, we reverse that portion of the district court's order (and vacate the related judgment) requiring Driskell to choose between punitive damages and attorney's fees, and remand for the district court to enter judgment for Driskell for punitive damages, attorney's fees, and untrebled compensatory damages.

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED*

TRAXLER, Senior Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's rejection of the issues raised by Summit in its appeal. As to Driskell's cross-appeal, I agree that Driskell failed to preserve for appeal his challenge to the amount of back-pay awarded by the district court, and I concur in that portion of the majority's opinion as well. In my view, however, the district court did not err in requiring Driskell to choose between the remedies available on his common-law wrongful-discharge cause of action and the remedies available on his statutory retaliatory-discharge claim. I therefore dissent from that aspect of the majority's decision.

## I.

The jury awarded Driskell $65,000 in actual damages on his REDA claim and on his wrongful-discharge claim, and $681,000 (reduced to the statutory maximum of $250,000) in punitive damages on the wrongful-discharge claim. On the election-of-remedies question, Driskell contended that under *United Laboratories, Inc. v. Kuykendall*, 437 S.E.2d 374 (N.C. 1993) ("*United Labs*"), he was entitled to recover the punitive damages awarded on the wrongful-discharge claim, along with untrebled actual damages and attorney's fees under REDA. The district court rejected that approach and accepted Driskell's second choice of recovering the remedies available under REDA -- $65,000 actual damages trebled to $195,000, plus attorney's fees. The district court awarded attorney's fees of just over $441,000, giving Driskell a total award of $636,000. If the district court had accepted Driskell's first choice, Driskell would have received $756,000.

On appeal, Driskell continues to pursue his first choice, arguing that he is entitled to $756,000 under the approach set out in *United Labs*. The majority, concluding that

28

punitive damages and the fee award were based on different conduct and serve different interests, holds that the district court erred under *United Labs* by requiring Driskell to elect between punitive damages and attorney's fees. I believe the district court correctly resolved the issue.

## II.

### A.

One of the purposes of the doctrine of election of remedies is to prevent "double redress for a single wrong." *Smith v. Gulf Oil Corp.*, 79 S.E.2d 880, 885 (N.C. 1954). In cases where a single set of facts supports a common-law claim and a statutory claim, North Carolina courts have applied the doctrine to hold that the plaintiff may recover under one cause of action or the other, but not both. *See Ellis v. N. Star Co.*, 388 S.E.2d 127, 132 (N.C. 1990) ("The company contends that it should be entitled to both punitive damages for the libel and the treble damages automatically assessed under N.C.G.S. § 75–16. We disagree. The libel and unfair trade claims both arose from the defendants' letter. Plaintiffs may in proper cases elect to recover either punitive damages under a common law claim or treble damages under N.C.G.S. § 75–16, but they may not recover both."); *Wilder v. Hodges*, 342 S.E.2d 57, 58 (N.C. Ct. App. 1986) ("When the same course of conduct supports claims for fraud and for an unfair or deceptive trade practice under Chapter 75, recovery can be had on either claim, but not on both."); *Marshall v. Miller*, 268 S.E.2d 97, 103 (N.C. Ct. App. 1980) ("Where the same course of conduct gives rise to a traditionally recognized cause of action, as, for example, an action for breach of contract, and as well gives rise to a cause of action for violation of G.S. 75-1.1, damages may be recovered either

29

for the breach of contract, or for violation of G.S. 75-1.1, but not for both."). These cases thus require a plaintiff to choose which cause of action or path to recovery on which he will proceed and permit him to recover only those remedies available on the chosen path.

In *United Labs*, however, the North Carolina Supreme Court departed from the approach outlined above and allowed a plaintiff to pick and choose from the remedies available on his common-law and statutory causes of action. *See United Labs,* 437 S.E.2d at 382 ("Heretofore, it has been the practice in this state to require the plaintiff to recover either the Chapter 75 statutory group of remedies (trebled compensatory damages and discretionary attorneys' fees) *or* the group of remedies available in the common law claim (compensatory and punitive damages).") (Meyer, J., concurring in part and dissenting in part).

In *United Labs,* the court permitted the plaintiff to recover punitive damages available under his common-law cause of action, as well as additional remedies available under N.C. Gen. Stat § 75–1.1(a), a statutory treble-damages scheme prohibiting unfair or deceptive acts and practices affecting commerce, as long as the remedies were neither inconsistent nor duplicitous. Under that approach, the court held that the plaintiff could recover punitive damages on his tort claim along with actual (untrebled) damages and attorney's fees under the unfair-practices statute. The court held that the untrebled actual-damage award and punitive-damage award were not duplicitous because they did not redress the same wrong. *See United Labs*, 437 S.E.2d at 381. As to attorney's fees, the court held they were not duplicitous because the punitive-damage award and fee award were based on different conduct:

> [The] conduct which gives rise to an award of attorneys fees is not the same conduct that gives rise to an award of punitive damages. To recover punitive damages at common law a plaintiff must show that the defendant acted in a willful or oppressive manner. *Hardy v. Toler*, 288 N.C. 303, 218 S.E.2d 342. To recover attorneys fees for unfair practices, however, the plaintiff must also show that "there was an unwarranted refusal by [the defendant] to fully resolve the matter which constitutes the basis of ... the suit." N.C.G.S. § 75–16.1(1). Since recovery of attorneys fees requires proof different from that which gives rise to punitive damages, the claims do not arise from "the same course of conduct." *Marshall*, 47 N.C. App. at 542, 268 S.E.2d at 103.

*United Labs*, 437 S.E.2d at 379-80.

Driskell relies on *United Labs* when seeking to mix and match the remedies available on his separate causes of action. In my view, however, *United Labs'* mix-and-match approach was legislatively overruled by N.C Gen. Stat. § 1D-20, which was enacted a few years after the case was decided.[1]

Section 1D-20 is part of an act passed in 1995 that limited the circumstances under which punitive damages could be awarded and placed a cap on the amount of punitive damages that could be awarded. *See* 1995 North Carolina Laws Ch. 514 (H.B. 729). The provisions of the 1995 act "appl[y] to every claim for punitive damages, regardless of whether the claim for relief is based on a statutory or a common-law right of action or based in equity," and "prevail over any other law to the contrary." N.C. Gen. Stat. § 1D-

---

[1] Although § 1D-20 was not raised by the parties, we may affirm the district court on any reason appearing in the record. *See McMahan v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 964 F.2d 1462, 1467 (4th Cir. 1992) ("We of course have the power to affirm a judgment for any reason appearing on the record, notwithstanding that the reason was not addressed below.").

10. Because Driskell sought punitive damages on his common-law wrongful-discharge claim, that punitive-damage claim is governed by the 1995 act, including § 1D-20.

Section 1D-20 provides that "[a] claimant must elect, prior to judgment, between punitive damages and any other remedy pursuant to another statute that provides for multiple damages." N.C. Gen. Stat. § 1D-20. In my view, the import of this language is clear. A plaintiff with a claim that supports an award of punitive damages on one cause of action as well as recovery under a multiple-damages statute must choose his path of recovery – he must "elect . . . between" *either* punitive damages *or* "any other remedy" available under the multiple-damages statute. *Id.* A plaintiff who chooses to recover *any* of the remedies available on the statutory multiple-damages claim cannot also recover punitive damages on a different claim based on the same facts. The statute thus returns to the pre-*United Labs* approach applied in *Ellis* and *Marshall*. The plaintiff must choose one path of recovery, either the statutory multiple-damages claim or the claim that includes punitive damages, and the plaintiff's recovery is limited to the remedies authorized for the chosen cause of action. If he wants to collect the award of punitive damages, he cannot collect *any* of the remedies available under the multiple-damages statute.

Although § 1D-20 is titled "Election of extracompensatory remedies," its reach is not strictly limited to the kinds of remedies that might be classified as "extracompensatory." An award of punitive damages is extracompensatory, as is an award of statutorily multiplied actual damages. However, § 1D-20 does not say that a plaintiff choosing a punitive-damages award may not recover *extracompensatory* remedies under a multiple-damages statute; § 1D-20 says that a plaintiff choosing a punitive-damages award

32

may not recover *any* of the remedies available under a multiple-damages statute, including the purely compensatory (unmultiplied) actual-damage award.

"In North Carolina, a trial court may award attorney's fees only as authorized by statute." *Winkler v. N.C. State Bd. of Plumbing*, 843 S.E.2d 207, 210 (N.C. 2020). Whether an award of attorney's fees might be characterized as compensatory or extracompensatory, there is little question that an award of attorney's fees authorized by statute is a remedy pursuant to that statute, as required under § 1D-20. *See, e.g., Buford v. Gen. Motors Corp.*, 451 S.E.2d 293, 298 (N.C. 1994) ("Attorney's fees are available as a remedy under N.C.G.S. § 20–351.8(3) . . . ."); *Minneman v. Martin*, 442 S.E.2d 564, 566 (N.C. Ct. App. 1994) ("The Act goes beyond merely allowing suit, however, and provides various remedies for the injured employee, including injunctive relief, damages, attorney's fees, and, in some cases, treble damages.") (citing N.C. Gen. Stat. § 126–87). Thus, if a multiple-damage statute authorizes an award of attorney's fees, that is one of the remedies that a plaintiff must forgo if he chooses to recover on his punitive-damage claim.

North Carolina courts have given scant attention to § 1D-20, and neither of the State's appellate courts have considered the operation of the statute.[2] In my view, however, the language of the statute is clear and unambiguous and prohibits a plaintiff from recovering punitive damages while also recovering any of the remedies available under a

---

[2]     Although North Carolina courts have applied *United Labs* in cases that I believe could have been resolved under § 1D-20, there is no indication the statute was raised in those cases. *See, e.g., Waldon v. Burris*, 2007 WL 91657 at *3 (N.C. Ct. App. 2007) (unpublished); *Brown v. King*, 601 S.E.2d 296, 298-99 (N.C. Ct. App. 2004).

multiple-damages statute. Applied to this case, my reading of § 1D-20 leads to same conclusion reached by the district court. Driskell is entitled to proceed under his wrongful-discharge claim, which permits punitive damages but not attorney's fees, or to proceed under his REDA claim, which permits attorney's fees but not punitive damages. He cannot, however, mix and match the remedies available under the separate claims.

B.

In any event, even if § 1D-20 has no effect on *United Labs*, I do not believe *United Labs* controls the disposition of this case.

As discussed above, the court in *United Labs* held that the punitive-damage award and fee award in that case were not duplicitous because the "conduct which gives rise to an award of attorneys fees is not the same conduct that gives rise to an award of punitive damages." *United Labs*, 437 S.E.2d at 379. The punitive-damages claim required the plaintiff to prove that "the defendant acted in a willful or oppressive manner," while the statutory attorney-fee award required further proof "'that there was an unwarranted refusal by [the defendant] to fully resolve the matter which constitutes the basis of . . . the suit.'" *Id.* at 379-80 (quoting N.C. Gen. Stat. § 75–16.1(1)). As this portion of the opinion makes clear, *United Labs* did not hold that punitive-damage awards and fee awards are *always* based on different conduct for election-of-remedies purposes. Instead, the court explicitly grounded its different-conduct decision on the additional fact the defendant's unwarranted refusal to fully resolve the claim -- that was statutorily required *in that case* to establish a claim for attorney's fees.

34

In this case, however, there is no additional statutory factor required to support a fee award. REDA simply provides that "[t]he court may award to the plaintiff and assess against the defendant the reasonable costs and expenses, including attorneys' fees, of the plaintiff in bringing an action pursuant to this section." N.C. Gen. Stat. Ann. § 95-243. Because attorney's fees may be awarded in *any* case where a REDA violation is established, it seems clear to me that, as the district court held, the conduct giving rise to the punitive-damages claim in this case is the very same conduct that gave rise to the fee award.

Although the award of punitive damages required Driskell to prove fraud, malice, or willful or wanton conduct, the evidence proving the wrongful discharge and establishing Summit's liability for punitive damages was the same evidence that proved the REDA violation and authorized the award of attorney's fees. Driskell was also required to show the reasonableness of the fee award sought, which required the court to consider the traditional factors, such as the time expended by counsel and the customary fees for similar cases Those factors, however, are not relevant to the election-of-remedies question. As the court made clear in *United Labs*, the question is whether the "conduct *which gives rise to an award of attorneys fees* is . . . the same conduct that gives rise to an award of punitive damages." *United Labs*, 437 S.E.2d at 379 (emphasis added). The court thus considered whether the *conduct of the defendant* that triggered liability for punitive damages was the same conduct that triggered liability for attorney's fees. The factors showing the reasonableness of the requested fees do not focus on the conduct of the defendant and have nothing to with the threshold question of whether the defendant engaged in conduct that

35

gave rise to an award of attorney's fees. Accordingly, the factual predicate for the *United Labs* approach – different conduct supporting the fee award – is absent in this case.

In reaching its conclusion, the *United Labs* court noted that punitive damages and fee awards serve different interests, *see* 437 S.E.2d at 380, an observation that can likewise be made in this case. That the awards serve different interests, however, is not sufficient; under *United Labs*, the awards must also involve different conduct. *See Stanley v. Moore*, 454 S.E.2d 225, 229 (N.C. 1995) (describing *United Labs* as permitting the recovery of punitive damages under a common-law cause of action and attorney's fees under a statutory unfair-practices claim "where [the] recoveries serve different interests *and* are not based on the same conduct") (emphasis added); *United Labs*, 437 S.E.2d at 380 (holding that election of remedies was not required because the "recoveries serve different interests *and* are not based on the same conduct") (emphasis added).

Because the same conduct that gave rise to Summit's liability for punitive damages on Driskell's wrongful-discharge claim also gave rise to the REDA violation and triggered the award of attorney's fees under REDA, I do not believe that *United Labs* governs the disposition of this case. Absent the factual basis justifying application of *United Labs'* approach, this case should be governed by North Carolina's traditional approach to election-of-remedies questions set out in *Ellis*, *Wilder*, and *Marshall*. Under that approach, Driskell was required to pick a single path to recovery, either wrongful discharge or REDA, and was entitled to receive only the remedies available on the chosen path. Punitive damages are available on Driskell's common-law wrongful-discharge claim, but attorney's fees are not. Conversely, attorney's fees are available under REDA, but punitive damages

36

are not. Under the circumstances of this case, I do not believe the district court erred by requiring Driskell to choose between the total recovery permitted under the wrongful-discharge claim or the total recovery permitted under REDA.

III.

Because I believe the district court properly resolved all of the issues raised in Summit's appeal and Driskell's cross-appeal, I would affirm the district court's judgment in its entirety. Accordingly, while I concur in sections I, II, and III.A of the majority opinion, I respectfully dissent from the majority's conclusion in section III.B that under *United Labs*, Driskell is entitled to recover punitive damages on his wrongful-discharge claim and attorney's fees on his REDA claim.